PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RANDALL S. PAGE,
          *Plaintiff-Appellant,*

          v.

LEXINGTON COUNTY SCHOOL DISTRICT
ONE,
          *Defendant-Appellee.*

─────────────────────────────

VIRGINIA SCHOOL BOARDS
ASSOCIATION; SOUTH CAROLINA
SCHOOL BOARD ASSOCIATION; NORTH
CAROLINA SCHOOL BOARDS
ASSOCIATION; MARYLAND
ASSOCIATION OF BOARDS OF
EDUCATION; NATIONAL SCHOOL
BOARDS ASSOCIATION; NATIONAL
SCHOOL PUBLIC RELATIONS
ASSOCIATION; NATIONAL PARENT
TEACHER ASSOCIATION; NATIONAL
LEAGUE OF CITIES; AMERICAN
ASSOCIATION OF SCHOOL
ADMINISTRATORS,
          *Amici Supporting Appellee.*

No. 07-1697

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(3:06-cv-00249-CMC)

Argued: March 20, 2008

Decided: June 23, 2008

Before WILLIAMS, Chief Judge, and NIEMEYER
and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Williams and Judge Duncan joined.

---

**COUNSEL**

**ARGUED:** Kevin Alan Hall, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellant. David Thomas Duff, DUFF, WHITE & TURNER, L.L.C., Columbia, South Carolina, for Appellee. **ON BRIEF:** Karl S. Bowers, Jr., William C. Wood, Jr., M. Todd Carroll, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellant. Breon C. M. Walker, DUFF, WHITE & TURNER, L.L.C., Columbia, South Carolina; Maree F. Sneed, Audrey J. Anderson, Joshua I. Civin, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellee. Helen L. Norton, Associate Professor of Law, UNIVERSITY OF COLORADO SCHOOL OF LAW, Boulder, Colorado; Kenneth L. Childs, John M. Reagle, CHILDS & HALLIGAN, P.A., Columbia, South Carolina; Francisco M. Negrón, Jr., General Counsel, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia, for Amici Supporting Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Lexington County School District One, a "body politic and corporate" under South Carolina law, used its website, e-mail, and other forms of communication to urge opposition to the Put Parents In Charge Act, a bill pending in the South Carolina legislature that proposed tax credits for private and home schooling. The School District believed that the bill, if enacted, would tend to undermine public education. Randall Page, who favored the bill, requested "equal access"

to the School District's "informational distribution system" to present his own message in support of the bill. When the School District refused his request, he commenced this action, claiming that the School District's refusal violated his First Amendment rights by discriminating against his point of view.

On cross-motions for summary judgment, the district court entered judgment in favor of the Lexington School District, concluding that the School District's campaign was largely "government speech" and that the School District's informational distribution system was not a public forum to which Page was entitled access. We agree and accordingly affirm.

I

The Board of Trustees of Lexington County School District One unanimously passed a resolution on December 14, 2004, expressing opposition to the Put Parents in Charge Act, a bill then pending in the South Carolina General Assembly, and urging the members of the Lexington County Legislative Delegation, as well as every member of the South Carolina General Assembly, to vote against the bill. The resolution noted that the Put Parents in Charge Act proposed tax credits for private and parochial school tuition and home-schooling expenses, which, the School District Board of Trustees believed, would erode funding for public education and therefore would "undermine[ ] the State's commitment to ensure that all South Carolina children enjoy the right to free, quality public education."

Following adoption of the resolution and in accordance with her responsibility, Mary Beth Hill, the Director of School/Community Relations for the School District, communicated the School District's position "through various channels to District committees and groups, staff and students, school community in general, and the public at large." Director Hill stated, "Since I am the District-level administrator having overall responsibility for the content of the District's webpage and other means of communication, I am the person who determines what materials are disseminated by the District to carry forward the Board's policy opposing school choice and [the Put Parents in Charge Act]."

Under Director Hill's instruction and supervision, the Lexington School District included information about the Put Parents in Charge Act on the "current issues" page of its website and stated its opposition to the bill. The page also contained links to documents related to the bill found on other websites, as well as to the interactive websites of two organizations opposed to the bill — "Choose Children First" and the South Carolina School Boards Association. Hill testified that she made the decision regarding which links to place on the School District's website, and she maintained the ability to delete any link on the website at any time. Moreover, she explained, no organization could request a link on the School District's website. Rather, she unilaterally made the decisions on what links to include "based on what is best for [the] children, what is best for the staff and students, what are the Board's goals for that year, and what are their legislative priorities for that year."

Director Hill also utilized the School District's e-mail facility to communicate the School District's opposition to the bill. She sent e-mails to the School District's Government Relations Committee and to other School District employees. The Government Relations Committee was made up of one staff member and one external representative (a parent or area resident) for each school, and sometimes included representatives unassociated with the schools. The e-mails sometimes included information written by third parties, which Hill explained was included or attached for the purpose of promoting the School District's message. But none of the persons who authored incorporated materials had requested inclusion of his or her materials and the decision to include them was Director Hill's alone.

Finally, Director Hill circulated fact-sheets and opinion pieces to schools in the district "to convey the Board's message." These materials included a reprint of an article entitled "Who Will Speak Up for Public Schools?" by Dr. Jim Ray, who was not a School District employee. The article was generally anti-tax-credit and anti-school-voucher in sentiment. The principals of two schools receiving the article included it in their newsletters that were sent home to students and parents. Director Hill again made clear that it was she who decided to circulate Dr. Ray's article, and not Dr. Ray or some third person.

On March 1, 2005, Randall Page, a citizen and resident of Lexington County who supported the Put Parents in Charge Act, sent a letter

to the Lexington School District expressing the fact that he was "most disturbed" to see not only that the School District maintained information on its website critical of the Put Parents in Charge Act but also that four schools in the district had distributed materials to their students and sent e-mails to faculty and staff which were critical of the bill. He then stated:

> It is most distressing to see that district time, resources and manpower were used in a way to attempt to affect legislation pending in the South Carolina General Assembly, presenting a one-sided view of the debate. I am hereby requesting that Lexington School District One permit equal access to present the other side of Put Parents in Charge to the district's parents and faculty/staff *by making available the same distribution method and resources*. I have materials, ready for distribution, to present the opposing viewpoint. I simply need *equal access to the distribution system* which has already been provided to those opposing the Governor's initiative.

(Emphasis added).

Two weeks later, the Lexington School District's Superintendent responded to Page's letter, telling him that "[i]t is the official position of this district, as well as every other school district in South Carolina that I am familiar with, to oppose the Put Parents in Charge bill because we believe such legislation is not in the best interest of public education, specifically, or the State, in general." The letter continued:

> Our activities in opposition to Put Parents in Charge are not improper; nor has our dissemination of information or distribution of materials created a right of "equal access" to our informational distribution system for you to present your views in support of the bill. The District does not permit the distribution of any type of outside information or materials which do not directly promote educational, recreational or cultural activities that would be of interest to students or their parents. Therefore, your request for equal access must be denied.

Page commenced this action under 42 U.S.C. § 1983 for a declaratory judgment that the Lexington School District's denial of access violated his First Amendment rights and an injunction requiring the School District to comply with Page's request for "equal access to present his viewpoint on school choice in each of the public fora established by the Defendant." He alleged in his complaint:

> By disseminating varying opinions from non-District employees via its e-mail system, website, facsimile machines, and newsletters, the District has created and has continuously maintained public fora, within the meaning of the case law interpreting the First Amendment.

> Under the First Amendment, the District may not abridge freedoms of expression of citizens in the District by discriminating against speech on subjects otherwise permissible in its public fora on the basis of the viewpoints expressed by that speech. The First Amendment forbids the District from regulating speech in public fora in ways that favor some conflicting viewpoints or ideas at the expense of others.

On cross-motions for summary judgment, the district court entered judgment in favor of the Lexington School District, finding that the School District did not create a forum for speech to which Page was entitled access and that the School District's activities were largely government speech wholly controlled by the School District.

From the district court's judgment, dated July 20, 2007, Page now appeals, arguing (1) that the "government speech doctrine" should not apply to speech in opposition to legislation; (2) that the speech here was not "government speech"; and (3) that the district court erred in finding that no forum for discussion was created to which Page was denied a right to equal access.

II

As an overarching position, Page asserts that Lexington County School District One engaged in impermissible viewpoint discrimination, in violation of the First Amendment, when it denied his request

for equal access to the "informational distribution system" that the School District used to disseminate its opposition to the Put Parents in Charge Act so that he could express his support of the bill. The School District agrees that it denied Page access to the channels of communication that it used to disseminate its opposition to the bill, but it asserts that those channels were dedicated to the School District's own speech and were not public forums to which private speakers were invited.

The School District's success in this case — based on the contentions of the parties — thus depends on whether its communications about its opposition to the Put Parents in Charge Act were government speech or whether the School District used its channels of communication to disseminate the viewpoints of *private speakers against* the Put Parents in Charge Act to the exclusion of *private speakers in favor of* the bill, thus discriminating in a limited public forum based on the speaker's viewpoint. Accordingly, we begin by addressing two connected questions: (1) whether the Lexington School District's campaign against the Put Parents in Charge Act was "government speech," and (2) whether the School District created a limited public forum, by inviting private speech to be expressed through its communications channels, to which Page was entitled access.

At the outset, we restate what is well established — that "the Government's own speech . . . is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). This observation arises from the well-understood role of government and the scope of the First Amendment. Even though government is supported by the taxes of all, its policies are not supported by all. It follows therefore that the government may advocate in support of its policies with speech that is not supported by all.

> Compelled support of government — even those programs of government one does not approve — is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the govern-

> ment will be spent for speech and other expression to advo-
> cate and defend its own policies.

*Johanns*, 544 U.S. at 559 (internal quotation marks omitted). Accord-
ingly, just as we accept that government may adopt policies for all of
the people, even if a policy is against the wishes of some, it may also
advocate in favor of those policies. That, however, does not suggest
that government can suppress opposing views. Its speech expressed
for itself is one thing, but its regulation of other persons' speech is
another. It is the regulation of private speech and discrimination with
respect to private speech that are the appropriate subjects of First
Amendment challenges.

The First Amendment protects against any governmental activity
that abridges the "freedom of speech" of non-governmental persons,
but it does not regulate the government's own policies or its speech
in support of them. Government speech "is, in the end, accountable
to the electorate and the political process for its advocacy." *Bd. of
Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235
(2000). Thus, "[i]f the citizenry objects [to the viewpoint expressed
by the government], newly elected officials later could espouse some
different or contrary position." *Id.*; *see also Sons of Confederate Vet-
erans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610,
618 (4th Cir. 2002).

Whether speech is government speech depends on the govern-
ment's ownership and control of the message, and the government's
ownership and control of the message may be determined from con-
sideration of various factors. We have identified factors such as (1)
the purpose of the program in which the speech occurs; (2) the "edito-
rial control exercised by the government" over the message; (3) the
identity of the person actually delivering the message; and (4) the per-
son "bear[ing] the ultimate responsibility for the content of the
speech." *Planned Parenthood of S. C., Inc. v. Rose*, 361 F.3d 786,
792-93 (4th Cir. 2004) (quoting *Sons of Confederate Veterans*, 288
F.3d at 618). After we identified these nonexclusive factors, the
Supreme Court issued its decision in *Johanns*, which distilled them,
particularly in cases involving the government's use of third-party
messages, focusing on (1) the government's *establishment* of the mes-

sage, and (2) its *effective control* over the content and dissemination of the message. *Johanns*, 544 U.S. at 560-62.

In *Johanns*, the federal government adopted a policy of promoting the consumption of beef and beef products, but to implement the policy, it adopted ad copy written by private parties in the beef industry. Holding that the promotional campaign was nonetheless government speech that was not subject to regulation by the First Amendment, the Supreme Court explained:

> The Secretary of Agriculture does not write ad copy himself. Rather, the Beef Board's promotional campaigns are designed by the Beef Board's Operating Committee, only half of whose members are Beef Board members appointed by the Secretary. . . . Respondents contend that speech whose content is effectively controlled by a nongovernmental entity . . . cannot be considered "government speech." We need not address this contention, because we reject its premise: The message of the promotional campaigns is effectively controlled by the Federal Government itself.

> The message set out in the beef promotions is from beginning to end the message *established by the Federal Government*. Congress has directed the implementation of a "coordinated program" of promotion . . . . Congress and the Secretary have also specified, in general terms, what the promotional campaigns shall contain . . . . Thus, *Congress and the Secretary have set out the overarching message* and some of its elements, and they have left the development of the remaining details to an entity whose members are answerable to the Secretary (and in some cases appointed by him as well).

> Moreover, the record demonstrates that *the Secretary exercises final approval authority over every word used in every promotional campaign*. All proposed promotional messages are reviewed by Department officials both for substance and for wording, and some proposals are rejected or rewritten by the Department. . . .

* * *

> *When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages.*

*Johanns*, 544 U.S. at 560-62 (emphasis added) (footnotes omitted).

In this case, the Lexington School District Board of Trustees *established* its message to oppose the Put Parents in Charge Act, adopting the view in its December 2004 Board meeting that the proposal for tax credits to private educators would divert public funds from public education, undermining the State's commitment to a free, quality public education for all South Carolina children. And the Board instructed its Director of School/Community Relations to communicate its position through its various communications channels to government employees, legislators, students, and the public at large, urging that the bill be voted down.

In carrying out her charge, the Director of School/Community Relations employed the School District's website, its e-mail facility, and its distribution channels to constituent schools — all channels of communications controlled by the School District. While the School District did not create the full content of every communication — for instance, it circulated an article written by Dr. Jim Ray, "Who Will Speak Up for Public Schools?" — it adopted and approved all speech, even that of third parties, as representative of its own position for inclusion in its messages opposing the bill. Thus, it also *controlled* the message.

In short, the nature of the School District's speech in opposing the Put Parents in Charge Act was strikingly analogous to the Secretary of Agriculture's speech in *Johanns* promoting the consumption of beef. In both situations, the government established the message; maintained control of its content; and controlled its dissemination to the public. Moreover, in both situations, the form of the message was, in part, adopted by the government from private sources.

### III

Page does not challenge the applicable legal principles, nor does he dispute the facts that the School District established its message and disseminated it through channels of communication available to it. But he contends that the School District did not maintain sufficient control over its channels of communication to entitle it to deny him access to them. He argues that private persons had access to those channels of communication with the effect that the School District created limited public forums to which he should have been given access. Thus, even though the School District may have intended to maintain control over its channels of communication, in Page's view it did not do so effectively and therefore created limited public forums in which he too should have been able to express his views in support of the Put Parents in Charge Act.

It is true that if the School District invited private speakers to use the platform of its channels of communication to speak in opposition, it could not then exclude private speakers who would speak in favor of the bill. Allowing such access to some would create a limited public forum in which the School District could not exclude speech based on its viewpoint.

In *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 46-49 (1983), the Supreme Court held that a school district appropriately excluded persons from its internal mail system because the school district's internal mail system was a "nonpublic forum." The school board policy did not grant general access but instead required those desiring access to the system to obtain the school principal's permission prior to distributing materials. "[I]n a nonpublic forum the government may employ a selective access policy in which individual non-ministerial judgments govern forum participation . . . subject to . . . two limitations: the policy must be reasonable and viewpoint neutral." *Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Schs.*, 457 F.3d 376, 383 (4th Cir. 2006) (internal quotation marks omitted).

Distinct from a nonpublic forum is a limited public forum, which is a place or channel of communication created "for use by the public at large for assembly and speech, for use by certain speakers, or for

the discussion of certain subjects." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *see also Child Evangelism Fellowship*, 457 F.3d at 382 (defining a "limited public forum" to exist where "the government creates a channel for a specific or limited type of expression where one did not previously exist"). In a limited public forum, "'the State may be justified in reserving [its forum] for certain groups or for the discussion of certain topics,'" but its activities in limiting the forum "must be viewpoint neutral and reasonable." *Child Evangelism Fellowship*, 457 F.3d at 382 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)) (alteration in original).

Page contends that the School District maintained inadequate control over each of the channels of communication it employed to disseminate its opposition to the Put Parents in Charge Act, and thus the School District created a limited public forum from which he could not be excluded based on his viewpoint. We address each channel that the School District employed to disseminate its message.

With respect to the School District's website, Page argues that the School District's inclusion of links to other websites caused the School District to lose control over content and therefore to fail the government-speech requirement of control. He reasons that links to other websites controlled by nongovernmental entities made available messages that may not have been in existence at the time the School District created the links. Therefore, any later-posted third-party statements would not have been subject to approval by the School District prior to posting. Page refers in particular to two links that the Lexington School District placed on its website in connection with its opposition to the Put Parents in Charge Act. The first was to the website of "Choose Children First," an organization formed to oppose the bill, and the second was to the website of the South Carolina School Boards Association, an organization that had expressed its opposition to the bill for the same reasons relied on by the Board of Trustees of the Lexington School District. Moreover, Page notes that the School District recognized the potential for changes in others' websites to which it provided links by including a disclaimer that reads, in relevant part:

> Some Lexington County School District One Webpages have links to other Web sites.

> These external Web addresses contain information created, published, maintained or otherwise posted by institutions or organizations independent of Lexington One. Lexington One does not endorse, approve, certify or control these external Web addresses and does not guarantee the accuracy, completeness, efficacy, timeliness, or correct sequencing of information located at such addresses.

> Use of any information obtained from such addresses is voluntary, and reliance on it should only be undertaken after an independent review of its accuracy, completeness, efficacy and timeliness.

Page's argument depends on an implied conclusion that by including a link to another organization's website, the School District made the contents of that other website part of its own website. This argument, however, assumes too much.

First, it must be noted that the links to other websites were selected by the School District alone as ones that supported *its own message*. There is no suggestion that the owners of the other websites took any initiative to be included on the School District's website.

Second, the School District wholly controlled its own website, retaining the right and ability to exclude any link at any time.

Third, the School District never incorporated on its own website any material from a website to which it had provided a link; it merely provided information that other websites supporting its position existed, and it facilitated viewing those websites with links.

Fourth, the School District continuously and unambiguously communicated a consistent message — its opposition to the Put Parents in Charge Act — and its providing references to others who shared that position was consistent with and supported the message, much as would a bibliography, a citation, or a footnote.

Finally, the School District "disclaimed" the contents of any linked website, making it clear that only that which was stated on its own website should be taken as the School District's speech.

Had a linked website somehow transformed the School District's website into a type of "chat room" or "bulletin board" in which private viewers could express opinions or post information, the issue would, of course, be different. But nothing on the School District's website as it existed invited or allowed private persons to publish information or their positions there so as to create a limited public forum. To the contrary, the School District retained complete control over its website, including the ability to take down its links to other sites at any time. This control was demonstrated by the fact that Director Hill removed the "Choose Children First" link when that organization changed its website to include information other than that relating to its opposition to the Put Parents in Charge legislation. She had included the link initially when Choose Children First had only one page on its website dedicated solely to the bill.

In sum, we conclude that the School District sufficiently controlled this channel of communication so that its speech remained government speech and it did not create a limited public forum by including links to other websites. The School District included every link to other websites *on its own initiative*, and it did so only insofar as the link would *buttress its own message*. It thus retained *sole control* over its message.

The same is true for the School District's e-mail facility. Page argues that because the School District included in or attached to some e-mails the article by Dr. Ray and other statements of private parties, it thereby created a limited public forum. Again, however, the School District, on its own initiative, selected Dr. Ray's article for inclusion and thus adopted it to support its own message. There is no suggestion that Dr. Ray or any other third person had access to the School District's e-mail facility. Instead, their materials were merely incorporated into content that the School District drafted and sent in furtherance of its own campaign in opposition to the Put Parents in Charge Act.

Finally, with respect to the other channels of distribution by which the School District distributed material to its constituent schools, superintendents, and principals, Page has advanced no evidence to suggest that those distribution mechanisms were available to anyone other than School District employees.

Accordingly, we conclude that the School District established its own message and effectively controlled the channels of communication through which it disseminated that message, as required for application of the government speech doctrine under *Johanns*, and therefore that it did not create a limited public forum to which Page was entitled access.

IV

Page contends additionally that newsletters distributed by individual schools within the School District were public forums to which he was entitled access, pointing particularly to the White Knoll Middle School PTSA newsletter which communicated opposition to the Put Parents in Charge Act.

The PTSA (Parent-Teacher-Student Association) newsletter that Page refers to, however, was not written by the School District, nor was it an official school newsletter. Rather, it was the newsletter of the White Knoll Middle School Parent-Teacher-Student Association, a third-party nongovernmental entity. While the opinion expressed in the PTSA newsletter in opposition to the bill was consistent with the School District's position, the newsletter opinion was not expressed as the School District's own message but as that of the White Knoll Middle School PTSA. Parent-Teacher-Student associations (or Parent-Teacher associations) are organizations affiliated with, but distinct from, the schools making up the School District, even though the procedures of such organizations are subject to editorial control by the schools' principals.

It may be true that by editorially controlling the newsletter, the individual school may have created a limited public or nonpublic forum because the speech in the PTSA newsletter was not the government's own speech, but speech of the Association. But that conclusion does not advance Page's request in this case to have access to the newsletter, because he has not demonstrated that he was within the class of persons who was, by design, accorded access to that forum. *See Perry*, 460 U.S. at 46 & n.7; *Child Evangelism Fellowship*, 457 F.3d at 383.

The district court concluded that even though the newsletter likely constituted a nonpublic forum, that forum was defined to allow access

to only "entities such as PTAs [PTSAs] and Booster Clubs which were closely associated with the schools" and that those restrictions were reasonable access restrictions, rather than a pretext for viewpoint discrimination. We agree with the district court's conclusions.

Regardless of whether the newsletter was a nonpublic or limited public forum, "[c]ontrol over access to [the forum] can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *see also Perry*, 460 U.S. at 46 (finding that status-based distinctions are acceptable in nonpublic or limited public forums "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"); *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 843 (6th Cir. 2000) (finding that a government entity may limit access to a nonpublic forum based on category of speaker or subject matter so long as the limitation is reasonable). In this case, limiting access to entities closely associated with the school and subject to the school principal's oversight and approval was both reasonable and viewpoint neutral, and therefore Page has not demonstrated unlawful viewpoint discrimination, as he has failed to demonstrate that this was a forum otherwise open to him but for his viewpoint.

V

Page also contends that he should have been granted access to disseminate his materials through any other distribution systems used by the Lexington School District and its constituent schools, such as its "take-home flyer" program, its fax facilities, and the Government Relations Council.

First, there is no evidence that the School District ever distributed or permitted anyone to distribute anything related to the Put Parents in Charge Act through these facilities. Therefore, Page never requested access to them because he asked to distribute his materials through channels of communication that had been used to disseminate the School District's position on the Put Parents in Charge Act.

In addition, as for the take-home flyer program, the School District permitted distribution of flyers to students only when they were pre-

approved by the School/Community Relations staff and only when the materials were from a § 501(c)(3) nonprofit organization that sponsored extracurricular activities for students (such as Boy Scouts or Little League) and, in addition, when they were "sign-up" or "registration announcements," rather than "message-driven" materials. As with the PTSA newsletter program, the take-home flyer program constituted at most a nonpublic or limited public forum, and the School District's restrictions on access to it were surely reasonable in the context of a public school.

For similar reasons, we reject Page's arguments with respect to other channels of communication, such as the School District's facsimile machines, the Government Relations Council, and other modes of communication that the School District had.

## VI

Finally, Page argues as a general matter that the government speech doctrine should, in any event, never apply when the government attempts to influence legislation. In essence, he urges that we adopt a content-based limitation on the government speech doctrine. His argument is grounded on the proposition that when the School District attempts to influence legislation, its position is not checked by the "ballot box," which is the traditional justification for accepting the government speech doctrine. *See Southworth*, 529 U.S. at 235 ("If the citizenry objects [to the message the government espouses], newly elected officials later could espouse some different or contrary position"); *Sons of Confederate Veterans*, 288 F.3d at 618 ("The rationale behind the government's authority to draw otherwise impermissible viewpoint distinctions in the government speech context is the accountability inherent in the political process"); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-42 (2001).

In this case, Page assumes erroneously that the ballot box is not available to check the government speech. He overlooks that "[school] board members are elected. They may be removed, at the next election, if the voters disagree with the manner in which they have exercised their discretion. No more immediate 'ballot box' remedy is suggested by the case law," as the district court appropriately noted.

Moreover, recognizing that government speech almost always supports a given policy objective and "[t]he government is entitled to promote particular messages," *Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 822 (4th Cir. 2001) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)), the School District can surely "take legitimate and appropriate steps to ensure that its message[s] [are] neither garbled nor distorted," *Rosenberger*, 515 U.S. at 833; *see also Rust v. Sullivan*, 500 U.S. 173, 194-95 (1991). It is therefore appropriate for the School District to defend public education in the face of pending legislation that it views as potentially threatening of public education.

Many courts have rejected First Amendment challenges to government speech involving advocacy regarding ballot measures. *See, e.g.*, *Kidwell v. City of Union*, 462 F.3d 620, 626 (6th Cir. 2006) (finding that "[t]he needs of effective governance command that the bar limiting government speech be high" in holding that the First Amendment did not prevent the city from advertising against a ballot referendum); *Cook v. Baca*, 95 F. Supp. 2d 1215, 1227-29 (D.N.M. 2000) (rejecting First Amendment challenge to advertisement placed by mayor on every citizen's water bill advocating for ballot initiative), *aff'd*, 12 Fed. Appx. 640 (10th Cir. 2001); *Ala. Libertarian Party v. City of Birmingham*, 694 F. Supp. 814, 818-21 (N.D. Ala. 1988) (holding that the First Amendment did not preclude city's advertising for ballot initiatives). While the issue in this case is not a ballot measure before individual voters, but rather a bill before the state legislature, grassroots lobbying of the type witnessed here nonetheless presents no greater concerns from a democratic accountability standpoint than advocacy regarding measures on the ballot. The ultimate target for the School District's campaign against the Put Parents in Charge Act was the State's General Assembly, and members of the General Assembly — the ones who will ultimately vote on the measure — are themselves public officials and have an independent responsibility to decide the public interest.

Accordingly, we reject Page's argument that the government speech regarding legislation in this case cannot fit within the boundaries of the government speech doctrine.

## VII

This case reduces to the straightforward circumstance where the Lexington School District determined to oppose the pending Put Parents in Charge Act and charged its School/Community Relations Director to communicate that message to virtually anyone who would hear it. The School/Community Relations Director employed the School District's website, e-mail facility, and other distribution methods to communicate the message to constituent schools, students, and the public. Throughout its campaign, the School District maintained control over the development and dissemination of its message, and it never allowed private persons to participate in the channels through which it disseminated its message so as to create a public forum. We agree with the district court that the School District engaged in government speech and that its speech did not implicate the First Amendment or Page's First Amendment rights.

The district court's judgment is accordingly

*AFFIRMED*.