136 Nev., Advance Opinion 83

IN THE SUPREME COURT OF THE STATE OF NEVADA

MICHAEL KOSOR, JR., A NEVADA
RESIDENT,
Appellant,
vs.
OLYMPIA COMPANIES, LLC, A
NEVADA LIMITED LIABILITY
COMPANY; AND GARRY V. GOETT, A
NEVADA RESIDENT,
Respondents.

No. 75669

FILED

DEC 31 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order denying an anti-SLAPP special motion to dismiss in a defamation action. Eighth Judicial District Court, Clark County; Michelle Leavitt, Judge.

*Reversed and remanded.*

Barron & Pruitt, LLP, and William H. Pruitt and Joseph R. Meservy, North Las Vegas,
for Appellant.

Kemp, Jones & Coulthard, LLP, and J. Randall Jones and Nathanael R. Rulis, Las Vegas,
for Respondents.

BEFORE PICKERING, C.J., HARDESTY and CADISH, JJ.[1]

---

[1]The Honorable Ron Parraguirre, Justice, voluntarily recused himself and took no part in the consideration of this appeal. The Honorable Kristina Pickering, Chief Justice, sits in his place.

20-44988

*OPINION*

By the Court, PICKERING, C.J.:

This case arises in the context of Nevada's anti-SLAPP protections, which appellant Michael Kosor says apply to his vociferous criticisms of the homeowners' association and developers/managers of the residential community of Southern Highlands in Clark County. Respondents, Olympia Companies, LLC, and its president and CEO, Garry V. Goett (collectively, Olympia)—said developers/managers—bore the brunt of those criticisms, which Kosor voiced at open meetings of the homeowners' association, distributed in a pamphlet and letter supporting his campaign for a seat on the homeowners' association board, and posted online; accordingly, Olympia sued Kosor for defamation. Because we conclude that each of Kosor's statements was "made in direct connection with an issue of public interest in a place open to the public or in a public forum," *see* NRS 41.637(4), we reverse the district court's decision to the contrary and remand for further proceedings consistent with this opinion.

I.

After purchasing a home in Southern Highlands, Kosor became an avid and outspoken participant at meetings for the community, serving as board member of a homeowners' sub-association and ultimately mounting several campaigns for election to the overarching Southern Highlands Community Association (the HOA). During the course of his activism, Kosor criticized the HOA for its decision to continue Southern Highlands' contracts with its developer, turned manager and operator, Olympia. Kosor claimed that these contracts financially benefited Olympia and the HOA at the expense of the community's individual homeowners.

The defamation complaint claims that Kosor made the first set of allegedly defamatory statements at an HOA sub-association board meeting: specifically, it claims that Kosor stated that Olympia met with Clark County Commissioners in a "dark room" and coerced them to act or vote in a particular manner, and that Olympia was "lining its pockets" at the homeowners' expense. Though Olympia says it subsequently sent Kosor a cease-and-desist letter, the complaint claims he continued to speak at meetings, including about how Olympia and the HOA had allegedly violated the law and breached their fiduciary duties to the homeowners. Kosor also posted a statement on the social media platform Nextdoor.com, in which he stated that Olympia obtained a "lucrative agreement" with Clark County by agreeing to shift expenses for the maintenance of public parks to the Southern Highlands homeowners.

Kosor made additional statements in connection with his first campaign for election to the HOA board of directors. His campaign website compared Olympia to a sort of foreign dictatorship and further raised the same allegations of supposed "sweetheart deals" between Olympia and Clark County officials to shift the costs of park maintenance from the county to Southern Highlands homeowners, statutory violations, breaches of fiduciary duty, and improper cost shifting. Kosor also distributed a pamphlet and letter to the Southern Highlands community echoing statements made on his website and further claiming that Olympia's actions have "already cost the homeowners millions."

Olympia sued Kosor for defamation and defamation per se. After filing an answer, Kosor moved to dismiss under NRS 41.660, Nevada's anti-SLAPP statute. The district court held that Kosor had failed to establish a prima facie case under NRS 41.660 and entered an order

SUPREME COURT
OF
NEVADA

(O) 1947A

denying the motion. Kosor appealed. *See* NRS 41.670(4) (providing a right of interlocutory appeal from a district court order denying a special motion to dismiss under NRS 41.660). The district court subsequently denied Kosor's motion for reconsideration in an order filed while this appeal was pending.

## II.

Nevada's anti-SLAPP statutes deter lawsuits targeting good-faith speech on important public matters. *See Coker v. Sassone*, 135 Nev. 8, 10, 432 P.3d 746, 748 (2019). If a party to a defamation lawsuit files a special motion to dismiss under Nevada's anti-SLAPP statutes and prevails, then that party is entitled to a speedy resolution of the case in its favor and recovery of attorney fees incurred in defending the action. *See* NRS 41.660 (rights); NRS 41.670 (remedies). We review a district court's decision refusing to dismiss under the anti-SLAPP statutes de novo. *Abrams v. Sanson*, 136 Nev. 83, 86, 458 P.3d 1062, 1065-66 (2020). And, "[i]n making such a determination, we conduct an independent review of the record." *Taylor v. Colon*, 136 Nev., Adv. Op. 50, 468 P.3d 820, 825 (2020).

## A.

To establish a prima facie case for anti-SLAPP protection, a movant needs to demonstrate "by a preponderance of the evidence, that [the underlying defamation] claim is based upon a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern." NRS 41.660(3)(a); NRS 41.637 (defining qualifying communications). Because the district court does not appear to have considered in depth whether Kosor made his communications in "good faith," we leave it to the district court to evaluate on remand whether Kosor can so demonstrate. Our analysis here addresses

only whether Kosor's statements fall within the specific statutory category of speech protected, for anti-SLAPP purposes, by NRS 41.637(4): "any . . . [c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum."

1.

To judge whether Kosor's statements addressed an issue of public interest, we apply five guiding principles. *Shapiro v. Welt*, 133 Nev. 35, 39, 389 P.3d 262, 268 (2017) (adopting five-factor test for "public interest" from *Piping Rock Partners, Inc. v. David Lerner Associates, Inc.*, 946 F. Supp. 2d 957, 968 (N.D. Cal. 2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015)). First, we cautioned in *Shapiro* that a "'public interest' does not equate with mere curiosity," *id.* at 39, 389 P.3d at 268; but here, each of Kosor's criticisms of Olympia fundamentally related back to his strident support for democratic participation in and governance over the large residential community where he resided, which undoubtedly goes beyond the airing of some trivial private dispute between private parties. *Cf. Rivero v. Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO*, 130 Cal. Rptr. 2d 81, 90 (Ct. App. 2003) (holding that the manner of a janitorial supervisor's "supervision of . . . eight individuals is hardly a matter of public interest"). Second, and relatedly, we stated in *Shapiro* that a matter of public interest is one of concern "to a substantial number of people," 133 Nev. at 39, 389 P.3d at 268, which Kosor's statements on matters pertinent to the "democratic subsociety" governing the nearly 8,000 Southern Highlands residences were. *See Damon v. Ocean Hills Journalism Club*, 102 Cal. Rptr. 2d 205, 209, 212 (Ct. App. 2000) (quoting *Nahrstedt v. Lakeside Vill. Condo. Ass'n*, 878 P.2d 1275, 1282 (Cal. 1994)) (citing *Macias v. Hartwell*, 64 Cal. Rptr. 2d 222, 225 (Ct. App. 1997)) (concluding that statements were about

public issues because they were about an HOA's decisions regarding governance, including whether the manager was competent to continue managing the community of 3,000 community members).

Third, in keeping with *Shapiro*, 133 Nev. at 39, 389 P.3d at 268, Kosor's statements were also directly tied to the public interest asserted above; that is, the appropriate governance of Southern Highlands. Kosor's questions and criticisms of Olympia and the HOA board were made in the context of his attempts to encourage homeowner participation in and oversight of the governance of their community. Finally, the subject matter of Kosor's statements makes evident that his "focus" in making them was not to prosecute any private grievance against Olympia, whether by "gather[ing] ammunition" or publicly communicating private matters, as prohibited by *Shapiro*'s fourth and fifth factors. 133 Nev. at 39, 389 P.3d at 268. Rather, his statements "concerned the very manner in which this group . . . would be governed—an inherently political question of vital importance to each individual and to the community as a whole." *Damon*, 102 Cal. Rptr. 2d at 212-13. Thus, we easily conclude that all of the complained-of statements concerned matters of public interest under NRS 41.637(4).

2.

With regard to whether Kosor's statements were made "in a place open to the public or in a public forum," NRS 41.637(4), this court has not yet adopted a test to determine that answer. Nor is the plain language of the statute alone sufficient to guide our inquiry. *See Delucchi v. Songer*, 133 Nev. 290, 299, 396 P.3d 826, 833 (2017) (looking to the language of the anti-SLAPP statutes first). But we are not without recourse. For one, as we have previously indicated, California's anti-SLAPP law includes a

similarly phrased category of speech subject to anti-SLAPP protections, and the case law of our sister state can therefore appropriately inform our analysis. *See Patin v. Lee*, 134 Nev. 722, 724, 429 P.3d 1248, 1250 (2018) (noting that in the anti-SLAPP context, where "no Nevada precedent is instructive on this issue, we [may] look to California precedent for guidance"); *compare* NRS 41.637(4) (providing that anti-SLAPP protection applies to "any . . . [c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum"), *with* Cal. Civ. Proc. Code § 425.16(e)(3) (West 2016) (protecting "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest"). And, where further guidance might still be necessary, federal First Amendment precedent can also be instructive. *See Abrams v. Sanson*, 136 Nev. 83, 87, 458 P.3d 1062, 1066 (2020) (interpreting anti-SLAPP provision, in part, with reference to federal case law); *Shapiro*, 133 Nev. at 39, 389 P.3d at 268 (adopting federal case law that collected and summarized California anti-SLAPP cases); *cf. Damon*, 102 Cal. Rptr. 2d at 209, 211 (defining "public forum" for anti-SLAPP purposes by reference to a First Amendment case, *Clark v. Burleigh*, 841 P.2d 975 (Cal. 1992), and concluding that a publication was a "public forum" for anti-SLAPP purposes because it had "a purpose analogous to [that of] a [traditional] public forum").

With regard to the allegedly defamatory statements Kosor made at HOA open meetings, the California case, *Damon*, is directly on point. In *Damon*, several homeowners in a large residential community made critical statements about the homeowners' association manager, who brought suit for defamation; the defendants moved to dismiss the lawsuit under California's anti-SLAPP statutes. 102 Cal. Rptr. 2d at 209-10.

Several of the statements at issue were made at homeowners' association board meetings, which the California court of appeal held were "public forums" for the purposes of the state's anti-SLAPP statutes. *Id.* at 210. In reaching this conclusion, the *Damon* court reasoned that the homeowners' association "played a critical role in making and enforcing rules affecting the daily lives of [community] residents" and further recognized that "[b]ecause of [a homeowners' association's] broad powers and the number of individuals potentially affected by [a homeowners' associations'] actions, the Legislature has mandated [they] hold open meetings and allow the members to speak publicly at the meetings." *Id.* The HOA here is no less of "a quasi-government entity" than that in *Damon*, "paralleling in almost every case the powers, duties, and responsibilities of a municipal government." *Id.* (quoting *Cohen v. Kite Hill Cmty. Ass'n*, 191 Cal. Rptr. 209, 214 (Ct. App. 1983)). Accordingly, the meetings at which Kosor made his statements here were likewise open, by legislative mandate, to all community members. NRS 116.31085 (creating a right of homeowners to attend HOA sessions, with several exceptions). We therefore conclude, consistent with the reasoning and holding of the California court of appeal in *Damon*, that the HOA meetings at which Kosor made certain of the statements at issue were "public forums" for the purposes of our anti-SLAPP statutes, because the meetings were "open to all interested parties, and . . . a place where members could communicate their ideas. Further, the . . . meetings served a function similar to that of a governmental body." 102 Cal. Rptr. 2d at 209.

The anti-SLAPP motion in *Damon* also dealt with allegedly defamatory statements made by homeowners' association members in printed materials, there a newsletter called the Village Voice that

SUPREME COURT
OF
NEVADA

(O) 1947A

functioned as "a mouthpiece for a small group of homeowners who generally would not permit contrary viewpoints to be published." *Id.* at 210. Despite the alleged editorial limitations on the opinions expressed in the Village Voice, the *Damon* court determined that the newsletter was a "public forum." *Id.* at 211. As a threshold matter, we agree with the *Damon* court that "[u]nder its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication." *Id.* at 210; *see also Abrams*, 136 Nev. at 88-89, 458 P.3d at 1067 (holding that an "email listserv may constitute a public forum for purposes of the anti-SLAPP statutes"). And we likewise agree that even a publication with a tightly controlled message—whether a community newsletter or, as in this case, an HOA election pamphlet and direct letter to Southern Highlands' homeowners—may qualify as a public forum where "it [is] a vehicle for communicating a message about public matters to a large and interested community." *See Damon*, 102 Cal. Rptr. 2d at 211. Here, the printed materials in question were another part of Kosor's efforts to drive civic engagement among community members and to affect management changes via democratic pressure—"If democracy is to work in Southern Highlands it requires your participation. . . . [Y]ou must vote. Do not assume others will." And inasmuch as the materials were distributed directly to the very members of the 8,000-home community that Kosor sought to mobilize, there could hardly be a more "interested" group of people with whom he could engage. Accordingly, we hold that the allegedly defamatory statements Kosor made in his election pamphlets and letter to homeowners were likewise made in a public forum for the purposes of NRS 41.637(4).

Finally, there are statements Kosor made online, whether on his personal campaign website or on the social media platform Nextdoor.com. On this question—that is, precisely when a privately established website qualifies as a public forum for the purposes of an anti-SLAPP defense—again, we have no clear precedent. We have firmly held that a government watch group's Facebook page qualifies as a public forum under anti-SLAPP laws, *see Stark v. Lackey*, 136 Nev. 38, 41 n.2, 458 P.3d 342, 345 n.2 (2020), but we have not yet elaborated on the limits of that reasoning. And, while it is well-settled in California law that all "[w]eb sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute," *Barrett v. Rosenthal*, 146 P.3d 510, 514 n.4 (Cal. 2006), we are not prepared to paint with such bold strokes here.[2]

For one, the United States Supreme Court has indicated that we should take "extreme caution" in this context—

> While . . . the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

*Packingham v. North Carolina*, ___ U.S. ___, ___, 137 S. Ct. 1730, 1736 (2017). And we are loath that our anti-SLAPP "cure [could] become the disease." *Navellier v. Sletten*, 52 P.3d 703, 714 (Cal. 2002) (Brown, J., dissenting); *cf.* Xiang Li, *Hacktivism and the First Amendment: Drawing*

---

[2]While we cited *Barrett*, 146 P.3d at 514 n.4, in a footnote in *Lackey* to support our agreement with the parties that the Nevada Department of Wildlife Facebook page was a public forum, we did not purport to endorse *Barrett* in its entirety.

*the Line Between Cyber Protests and Crime*, 27 Harv. J.L. & Tech. 301, 316 (2013) (suggesting that cyberattacks on private websites could qualify for constitutional protection if those sites were deemed "public forums"); Micah Telegen, *You Can't Say That: Public Forum Doctrine and Viewpoint Discrimination in the Social Media Era*, 52 U. Mich. J.L. Reform 235, 248 (2018) (noting that various private social networking sites' hate speech limitations would be constitutionally questionable if government-created pages on the site were deemed "public forums").

Moreover, California courts' broad holding regarding the public character of the internet comports with the particular legislative instruction it has been given, that the state's anti-SLAPP provision *"be construed broadly."* Cal. Civ. Proc. Code § 425.16(a) (emphasis added). But Nevada's anti-SLAPP provisions contain no such mandate. And where Nevada's statutory language differs from that of an otherwise similar statute, foreign precedent applying that language—by which we are not bound in any case—becomes even less persuasive. *See Int'l Game Tech., Inc. v. Second Judicial Dist. Court*, 122 Nev. 132, 154, 127 P.3d 1088, 1103-04 (2006) (noting that "the presumption that the Legislature, in enacting a state statute similar to a federal statute, intended to adopt the federal courts' construction of that statute, is rebutted when the state statute clearly reflects a contrary legislative intent").[3]

Additionally, perhaps as a result of the legislatively mandated breadth of California's anti-SLAPP statutes, *Barrett's* blanket holding and the progeny that extends therefrom leapfrog what is traditionally a critical

---

[3]NRS 41.665(2) endorses California anti-SLAPP law with respect to the burden of proof, but this does not apply more broadly to the statutory interpretation issues addressed in the text.

initial step in public forum analysis. To wit: when examining statements made online, the California cases at issue broadly discuss the entire internet as the "public forum" in question. *See Wilbanks v. Wolk*, 17 Cal. Rptr. 3d 497, 505 (Ct. App. 2004) (analogizing "the Web, as a whole" to a public bulletin board that "does not lose its character as a public forum simply because each statement posted there expresses only the views of the person writing that statement"). But, given that the Legislature has not demanded the same breadth in our application of Nevada's anti-SLAPP statutes, we look to Supreme Court precedent on this point, which, in the First Amendment context, suggests that the scope of the relevant forum should be more closely tailored to the specific circumstances at issue. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800-02 (1985) (narrowing scope of relevant forum from the physical site of a federal workplace to the intangible site of a charitable campaign for workers at the site, and collecting cases); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) (defining school's internal mail system and the teachers' mailboxes as forum rather than school property as a whole and stating that "the First Amendment [does not] require[ ] equivalent access to all parts of a school building in which some form of communicative activity occurs"); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 300-02 (1974), (treating the advertising space on buses, rather than city-owned public transportation more generally, as the forum). Simply put, we are not prepared to say that nearly every website is a "public forum" simply because "[o]thers can create their own Web sites or publish letters or articles through the same medium [i.e., the internet], making their information and beliefs accessible to anyone interested in the topics discussed," *Wilbanks*, 17 Cal. Rptr. 3d at 505; in our view, the question is, more limitedly, whether

the particular post or website at issue "bear[s] the hallmarks of a public forum." *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019).

We have previously looked toward related federal precedent in applying our anti-SLAPP laws. *See Shapiro*, 133 Nev. at 39, 389 P.3d at 268 (adopting the principles enunciated in *Piping Rock Partners*, 946 F. Supp. 2d at 968). And federal courts' application of First Amendment "public forum" concepts to electronic mediums offers a reasoned, limited departure from the sweeping holding that California's requirement for a "broad reading" of anti-SLAPP statutes demands. For instance, in determining whether a government official's Facebook page was a public forum within the context of First Amendment restrictions, the Fourth Circuit analyzed according to traditional characteristics of public forums, specifically: whether the site was "compatib[le] with expressive activity" and the extent to which the site allowed free interaction between the poster and constituent commentators. *Davison*, 912 F.3d at 682 (quoting *Cornelius*, 473 U.S. at 802).[4] And, in a decision that was subsequently affirmed by the Second Circuit, the Southern District of New York seemed to tailor the scope of the public forum in question even more narrowly, using the same traditional public forum principles to hold that the *"interactive space of a tweet* sent by [Donald Trump]" qualified as a public forum. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 574 (S.D.N.Y. 2018) (emphasis added), *aff'd*, 928 F.3d 226 (2d Cir. 2019). The question then, in federal courts, is whether the limited page, or as

_____

[4]Importantly, the Fourth Circuit also rejected arguments that traditional public forum analysis did not apply because the Facebook page was not government property, noting that the United States Supreme Court "never has circumscribed forum analysis solely to government-owned property." *Davison*, 912 F.3d at 682-83.

appropriate, post, at issue creates a forum for citizen involvement. *See City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175 (1976); *Page v. Lexington Cty. Sch. Dist. One*, 531 F.3d 275, 284-85 (4th Cir. 2008) (applying traditional public forum analysis before holding that a school district's website was not a public forum because there was no interactive space).

Looking toward this federal guidance, we believe that Kosor's Nextdoor.com post qualifies as a public forum for the purposes of anti-SLAPP protections. The appellate record includes a printout of Kosor's post and the responses thereto, from which it appears that Kosor's post, like his HOA meeting commentary, campaign flyer, and printed letter, sought to open conversation among Southern Highlands community members and enlist their participation in the community's decision-making process: "[W]rite/email/call our Commissioners and . . . [t]hen join us at Wednesday's Clark County Commission meeting . . . ." And Kosor's post opened up an opportunity for other community members to publicly respond to its content, which they did; for example, one respondent asked "What do you think, neighbors? . . . [t]his is an opportunity for all of us to be heard and to decide as a COMMUNITY . . . ." Other responses simply thanked Kosor for his "yeoman service and doggedness. Without [which] . . . none of this detail would have bubbled up to the knowledge of the residents." Accordingly, Kosor's post sought and ultimately facilitated an exchange of views on what we have already deemed to be subject matter of public interest. *Davison*, 912 F.3d at 682 (reasoning that Facebook page was a public forum because "[a]n 'exchange of views' is precisely what [the page creator] sought—and what in fact transpired—when she expressly invited 'ANY Loudoun citizen' to visit the page and comment 'on ANY issues,' and

Supreme Court
OF
Nevada

(O) 1947A

received numerous such posts and comments"); *see also Packingham*, ___ U.S. at ___, 137 S. Ct. at 1735 (describing the internet as "the most important place[ ] (in a spatial sense) for the exchange of views"); *Page*, 531 F.3d at 284 (holding that a school district website was not a public forum, but that if there was a "'chat room' or 'bulletin board' in which private viewers could express opinions or post information, the issue would, of course, be different"). And while printouts of certain Nextdoor.com pages in the record suggest that parties must enter their name and address in order to view website posts—that is, that Kosor's post might not have been entirely, freely accessible to every member of the public without any limitation—these steps do not seem to differ significantly from that which might be required to view posts on Facebook; that is, a post on Nextdoor.com is as compatible with expressive activity as one on the other platform, which we have already held can support a public forum. *See Stark*, 136 Nev. at 41 n.2, 458 P.3d at 345 n.2 (agreeing that a government watch group's Facebook page was a public forum). Kosor's statements in his Nextdoor.com post were therefore made in a public forum under the federal standards discussed above and our anti-SLAPP statute.[5]

With regard to statements on Kosor's personal website, the main, related, interactive space appears to be a "Contact Me" form included at the bottom of each page. But the printouts from his website also demonstrate some additional interactivity, given that Kosor seems to have posted on the site responses to "Frequently Asked Questions," as well as

---

[5]Note that, in keeping with *Knight*, 302 F. Supp. 3d at 574, we do not hold that every Nextdoor.com post creates a public forum; the content of any particular post could affect whether the forum is, in fact, one for citizen engagement.

links to *Las Vegas Review-Journal* articles discussing topics relevant to the Southern Highland community. Moreover, the overall thrust of subject matter on Kosor's site is consistent with the purpose discussed above, that is, to promote civic engagement; his site is replete with attempted calls of Southern Highlands to action—"Our community must engage on the political front as others are doing"; "Unless we intervene as a community the Sports Park we were originally promised will never happen"; "The collective owners in [Southern Highlands] have a much larger investment in the community than does the Developer. We deserve a fair share vote"; "We have a large political block as a community capable of insisting on quality maintenance." Kosor's site also appears to include a copy of the letter discussed above, which urges homeowner "participation" in the Southern Highlands community and promotes voting in the HOA board election as a way to make "democracy work in Southern Highlands." In light of the site's interactive components, content, and purpose, we believe Kosor's site qualifies as a public forum within the meaning of our anti-SLAPP statutes.

### III.

Accordingly, we conclude that Kosor met his prima facie burden to demonstrate that the statements in question were all made in public forums on a matter of public interest. We therefore reverse the district court and remand with direction that it consider whether Kosor made his communications in "good faith," in light of all the supporting evidence provided by Kosor. *See Rosen v. Tarkanian*, 135 Nev. 436, 439, 453 P.3d

1220, 1223 (2019) (examining all submitted evidence in an anti-SLAPP case even where the moving party had failed to attach an affidavit).

_____*Pickering*_____, C.J.
Pickering

We concur:

_____*Hardesty*_____, J.
Hardesty

_____*Cadish*_____, J.
Cadish

SUPREME COURT
OF
NEVADA

(O) 1947A