In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1102 & 09-1112

BADGER CATHOLIC, INC., formerly
known as Roman Catholic Foundation,
UW–Madison, Inc., *et al.*,

*Plaintiffs-Appellees,*

*Cross-Appellants,*

*v.*

DAVID G. WALSH, *et al.*,

*Defendants-Appellants,*

*Cross-Appellees.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 07-C-505—**Lynn Adelman**, *Judge.*

ARGUED OCTOBER 27, 2009—DECIDED SEPTEMBER 1, 2010

Before EASTERBROOK, *Chief Judge*, and EVANS and
WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* The University of Wisconsin
at Madison charges every student a fee, which goes

into funds for extracurricular activities. The fund dedicated to student services (such as counseling and tutoring) distributes about $2.5 million annually. Many of the recipients use the money to offset the costs of speech: funded organizations include FH King (which promotes sustainable agriculture), the MultiCultural Student Coalition (which promotes "social justice and the principles of unity, integrity, responsibility, and respect"), and Sex Out Loud (which promotes "healthy sexuality"). When some students objected to paying for other students' speech, the University defended its program as creating a public forum that advances its academic mission using viewpoint-neutral criteria. The Supreme Court accepted this assurance that funds are distributed without regard to the speakers' perspectives and concluded that a neutral, forum-creating program could be funded by a uniform fee collected from each student. *University of Wisconsin v. Southworth*, 529 U.S. 217 (2000).

Among the applicants for funds at the University's Madison campus is a student organization that, when it applied for recognition as a "registered student organization" eligible for money, was known as the University of Wisconsin Roman Catholic Foundation. In 2007 it changed its name to Roman Catholic Foundation, UW–Madison. Last year the group became Badger Catholic. We use the current name, which has the virtue of brevity if not stability. Badger Catholic's application for student-organization status was rejected because its members and officers included some non-students, such as a bishop. A reorganization eventually

satisfied the University that students are in control, and the University's Chancellor approved Badger Catholic as a registered student organization in 2007. To be eligible for reimbursement, a group must submit a budget for the approval of student government and eventually the administration. Badger Catholic has had trouble with this process. Each budget has been rejected at least in part by the student government, the administration, or both on the ground that much of Badger Catholic's speech is religious in character. The University won't pay for three categories of speech: worship, proselytizing, and religious instruction. It is willing to use student activity fees for what it calls dialog, discussion, or debate from a religious perspective, but not for anything that it labels worship, proselytizing, or religious instruction.

These categories have little meaning on their own, but examples demonstrate where the University has drawn the line. One of the district court's opinions sets out the six specific programs for which the University has refused to reimburse any of the group's expenses. 590 F. Supp. 2d 1083, 1088–89 (W.D. Wis. 2008). One program is called "mentoring for busy students" and entails meetings between students and "one of the spiritual directors for spiritual mentoring/counseling and to talk about anything they wanted for a half-hour. The spiritual directors included Catholic nuns and priests who would offer guidance or prayer if requested by the student." Another program was a summer retreat for leadership training. During the four-day retreat, three masses were said and four communal prayer sessions held.

Although the University promised the Supreme Court in *Southworth* to distribute funds without regard to the content and viewpoint of the students' speech, it has concluded that this promise does not apply to speech that constitutes the practice of religion. In response to Badger Catholic's suit under 42 U.S.C. §1983, the University (as we call the defendants collectively) contended that funding for prayer, proselytizing, or religious instruction would violate the Establishment Clause of the First Amendment (applied to the states through the Fourteenth Amendment), and that the obligation not to violate the Constitution is a compelling interest that justifies a departure from neutrality. The district court concluded, however, that reimbursing the expenses of religious speakers, through a program equally available to secular speakers, does not violate the Establishment Clause, and that, having established a public forum (which is how *Southworth* treats the student-fee program), the University must not exclude speakers who want to use the forum for worship. 578 F. Supp. 2d 1121 (W.D. Wis. 2008), reconsideration denied, 590 F. Supp. 2d 1083 (W.D. Wis. 2008).

The court entered a declaratory judgment providing that the University must reimburse Badger Catholic's activities on the same basis as it reimburses other student groups. The University is free to decline funding for all summer retreats; if it does not pay for training workshops over the summer for members of FH King, it need not pay for Badger Catholic's retreats either. Likewise, if the University refuses to fund a group such as Sex Out Loud that counsels students to engage in

"healthy sexuality" (and distributes contraceptives to reduce the risk), it need not fund a group that counsels from a religious perspective. If the University decides that no student group should receive more than 1% of the fund, or some dollar cap, it could apply that neutral rule to Badger Catholic in common with all other claimants on the limited pot. But having decided that counseling programs are within the scope of the activity fee, the University cannot exclude those that offer prayer as one means of relieving the anxiety that many students experience.

The district court correctly read the Supreme Court's decisions in holding that the University would not violate the Establishment Clause by funding Badger Catholic's programs. Two decisions in particular—*Widmar v. Vincent*, 454 U.S. 263 (1981), and *Rosenberger v. University of Virginia*, 515 U.S. 819 (1995)—support that conclusion.

The University of Missouri at Kansas City allowed student groups to use its facilities, but it withheld permission for a group called Cornerstone, which wanted to use a meeting room for "religious worship and religious discussion*." Widmar*, 454 U.S. at 265. (Cornerstone's normal program included "prayer, hymns, Bible commentary, and discussion of religious views and experiences", *id*. at 265 n.2.) The University of Missouri contended, just as the University of Wisconsin has done, that any subsidy to worship would violate the Establishment Clause—and it added that providing a rent-free room on campus is a subsidy as surely as the transfer of cash to pay for renting a room off campus. The

Justices agreed with the premise that a free room is a form of subsidy but not with the conclusion that a subsidy violates the Establishment Clause. As long as the University makes facilities equally available to secular and sectarian groups, the Court held, there is no constitutional problem. Indeed, *Widmar* added, excluding a religious speaker would amount to content discrimination, which is forbidden in a public forum such as the one the University had established. Cornerstone therefore was entitled to a room where its members could meet, pray, sing hymns, and proselytize.

A decade after *Widmar*, the University of Virginia declined to pay for the expense of printing *Wide Awake*, a religious newspaper that a student group published in an effort to educate and convert other students (in other words, to proselytize). The University of Virginia conceded that this was content discrimination but contended, just as the University of Wisconsin has, that by devoting part of the student-activity fund to religious speech, it would violate the Establishment Clause. Although *Widmar* was seemingly against it, the University of Virginia contended that there is a difference of constitutional magnitude between providing services in kind (such as making meeting rooms available) and handing over cash or reimbursing a religious speaker's expenses. The Supreme Court rejected that effort to distinguish *Widmar*, holding that cash and in-kind subsidies must be treated identically. 515 U.S. at 832–34. And the Court reiterated *Widmar*'s conclusion that withholding support of religious speech when equivalent

secular speech is funded is a form of forbidden viewpoint discrimination. *Id*. at 828–30.

Decisions since *Rosenberger* reinforce its conclusion that underwriting a religious speaker's costs, as part of a neutral program justified by the program's secular benefits, does not violate the Establishment Clause even if the religious speaker uses some of the money for prayer or sectarian instruction. One good example is *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), which held that states may allow school vouchers to be used at religious schools without violating the Constitution, when the decision about which school to attend reflects a private choice about how best to educate children. Similarly, *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), held that a school would not violate the Establishment Clause by providing facilities to a religious group, which proposed to use them for singing religious songs, praying, and memorizing scripture, when the facilities were equally available to secular groups—and *Good News Club* added that any departure from neutrality would be viewpoint discrimination that is forbidden in a public forum, which the school district created by allowing private groups to use its facilities. See also *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481 (1986) (reimbursing the tuition of a theology student does not offend the Establishment Clause, when the scholarship is part of a program that is neutral with respect to religion and the student chooses where to use the scholarship).

These decisions dispose of the University's contention that, in refusing to fund Badger Catholic's proposed

activities, it was engaged in content discrimination rather than viewpoint discrimination. Two district judges have handled parts of this litigation. Judge Shabaz called the University's distinction viewpoint discrimination. 2008 U.S. Dist. LEXIS 4137 (W.D. Wis. Jan. 17, 2008). After the suit was transferred when Judge Shabaz stopped hearing cases, Judge Adelman called it content discrimination. 578 F. Supp. 2d at 1137. Both judges thought the discrimination unconstitutional.

The Supreme Court is not always clear about the difference; in *Rosenberger* it said that "[v]iewpoint discrimination is [just] an egregious form of content discrimination." 515 U.S. at 829. Elsewhere it has held that content discrimination can be part of a lawful system of allocating limited funds; this is why a university could decline to pay for any retreats or counseling, if the content of the speech would place it outside the scope of the program. (One example, from *Christian Legal Society v. Martinez*, 130 S. Ct. 2971, 2998 (2010) (Kennedy, J., concurring): A university can decline to pay for an art historian to address a conference devoted to public transit, because the art historian's perspective is outside the scope of the conference.) A university can define the kind of extracurricular activity that it chooses to promote, reimbursing, say, a student-run series of silent movies and a debate team, while leaving counseling to the student-health service that the university operates itself. But the University of Wisconsin has chosen to pay for student-led counseling, and its decision to exclude counseling that features prayer is forbidden under *Widmar* and its successors. The label applied to that discrimination is unimportant.

Although the University's main theme in the district court was that reimbursement would violate the Establishment Clause, its main theme on appeal is that a public agency is entitled to withhold funds from religious speech, even though not commanded by the Establishment Clause to do so. *Zelman* held that a state is *entitled* to offer school vouchers that can be cashed at sectarian schools but not that it is *required* to do so. Arguments such as Professor (then judge, and now professor again) McConnell's that the Constitution requires a state to follow a principle of neutral funding have not carried the day at the Supreme Court. See Michael W. McConnell, *The Selective Funding Problem: Abortions and Religious Schools*, 104 Harv. L. Rev. 989 (1991).

One recent illustration of the Justices' willingness to allow states to exclude some religious uses from public expenditures is *Locke v. Davey*, 540 U.S. 712 (2004). A state program of college scholarships had a proviso: the money could not be used to study for the ministry. The Court held that although the state could have allowed the money to be spent for studies in devotional theology (citing *Witters*), the restriction was compatible with the Free Exercise Clause, because "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." 540 U.S. at 719. By choosing not to use public funds to train ministers, the state was making a choice no different from operating a university that includes a department of philosophy but not a department of theology or a seminary. The University of Wisconsin contends that it has made the sort of choice that *Locke* approved.

That's not entirely right, and for two reasons. First, the Court stressed in *Locke* that the state's program did not evince hostility to religion. The scholarships could be used at pervasively sectarian colleges, where prayer and devotion were part of the instructional program; only training to become a minister was off limits. 540 U.S. at 724–25. The University of Wisconsin, by contrast, does not support programs that include prayer or religious instruction. Second, and more importantly, the state's decision in *Locke* concerned how to use funds over which it had retained plenary control. Choosing which programs to support and which not, whether by having a department of philosophy but not a seminary, or by granting scholarships to study theology but not prepare for the ministry, is a form of government speech. See *Pleasant Grove v. Summum*, 129 S. Ct. 1125 (2009); *Illinois Dunesland Preservation Society v. Illinois Department of Natural Resources*, 584 F.3d 719 (7th Cir. 2009). That's why *Locke* declared that public-forum analysis was "simply inapplicable." 540 U.S. at 720 n.3. But the University of Wisconsin is not propagating its own message; it has created a public forum where the students, not the University, decide what is to be said. And having created a public forum, the University must honor the private choice.

Readers who think that this line is overly formalistic—selective funding as permissible public choice, versus selective funding as impermissible restriction on private choice in a public forum—must recall that the University of Wisconsin itself persuaded the Supreme Court to hold that dissatisfied students are not entitled

to get their student-activity fees back, precisely because the fees are used to operate a public forum in which students themselves, and not the University, decide what is to be said. The Supreme Court gave its imprimatur in *Southworth*, with the proviso that the University must establish neutral rules and not shut out any perspective that is within the program's general definition of extra-curricular student activity. Just as there is a big difference between a university as publisher of its own newspaper and as censor of a student paper—the university may choose as publisher what goes into the alumni news but cannot censor a paper or selectively decline to pay where students are the publishers, see *Hosty v. Carter*, 412 F.3d 731 (7th Cir. 2005) (en banc)—so a university cannot shape Badger Catholic's message by selectively funding the speech it approves, but not the speech it disapproves. Once it creates a public forum, a university must accept all comers within the forum's scope. This is why, in another decision arising from the University of Wisconsin's fee system, we held that the University is not entitled to exercise a general discretion over which groups can draw on the funds. See *Southworth v. University of Wisconsin*, 307 F.3d 566 (7th Cir. 2002).

The University's assurance that it will fund discussion and debate, including discussion with a religious component, because it views discussion and debate as an important part of education, coupled with a declaration that there is just too much devotional activity in Badger Catholic's program, leads us to wonder how the University would deal with an application by a student group comprising members of the Society of Friends.

Quakers view communal silence as religious devotion, and a discussion leading to consensus as a religious exercise. Adherents to Islam and Buddhism deny that there is any divide between religion and daily life; they see elements of worship in everything a person does. Now maybe Quakers, Muslims, and Buddhists scorn the University's largesse (as Badger Catholic did until 2003), but a constitutional rule must be general enough to handle all sorts of religion and all choices by student groups.

We deferred action on this appeal while the Supreme Court had *Christian Legal Society* under advisement. It is the latest in the sequence, beginning with *Healy v. James*, 408 U.S. 169 (1972), and extending through *Widmar*, *Rosenberger*, and *Southworth*, in which colleges or universities set limits on what student organizations they would recognize and fund. *Healy*, which forbade viewpoint discrimination, did not concern religion, so we have not discussed it. All the other cases in this sequence concern student groups that engage in sectarian speech. We wanted to see whether the Court would modify the approach articulated in *Widmar*, *Rosenberger*, and *Southworth*. The Court left that approach in place and reiterated the norm that universities must make their recognition and funding decisions without regard to the speaker's viewpoint. The Justices divided on the question whether Hastings College of the Law had satisfied the neutrality requirement, but no Justice disagreed with the propositions that "[a]ny access barrier must be reasonable and viewpoint neutral" (130 S. Ct. at 2984)

and that "singl[ing] out religious organizations for disadvantageous treatment" (*id.* at 2987) is permissible only if the requirements of "strict scrutiny" can be satisfied. *Christian Legal Society* described *Widmar* as a case holding that refusing to allow "religious worship and discussion" in a public forum is forbidden viewpoint discrimination (*ibid.*). There can be no doubt after *Christian Legal Society* that the University's activity-fee fund must cover Badger Catholic's six contested programs, if similar programs that espouse a secular perspective are reimbursed.

This conclusion disposes of the University's appeal. Badger Catholic has filed a cross-appeal seeking additional relief. It asked the district court for damages and an injunction; the judge awarded only a declaratory judgment. The request for damages founders on the Supreme Court's decision that a state (including a state official sued in an official capacity) is not a "person" for the purpose of §1983, see *Will v. Michigan Department of State Police,* 491 U.S. 58 (1989), which means that damages from the state treasury are not available under that statute. See, e.g., *Lapides v. University System of Georgia,* 535 U.S. 613, 617–18 (2002); *Arizonans for Official English v. Arizona,* 520 U.S. 43, 69 (1997). The University of Wisconsin is part of the state, Wis. Stat. §§ 36.01–36.62; *Southworth,* 529 U.S. at 221, so damages cannot be awarded under federal law.

Badger Catholic sees two ways around this. One is damages from the defendants in their individual capacities. The district court held, however, that in this capacity

the defendants enjoy the benefit of official immunity. Divided decisions such as *Christian Legal Society* and *Locke* show that this corner of the law cannot be regarded as so clear that personal liability is appropriate. "If judges . . . disagree on a constitutional question, it is unfair to subject [public officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Accord, *Pearson v. Callahan*, 129 S. Ct. 808, 823 (2009).

Badger Catholic's other avenue to damages is state law. After the University declined to reimburse some of its expenses in earlier academic years, the parties reached an agreement under which Badger Catholic's requests would be reconsidered. Badger Catholic contends that the University has not kept its promise, and that it is entitled to compensation for breach of contract. Here its problem is that it did not give the notices required by Wisconsin law. Wis. Stat. §16.007 (claims against the state), §893.82(3) (claims against state employees). Badger Catholic concedes that it did not follow the state's procedures but contends that noncompliance should be excused because the state knew what relief it wants. We agree with the district court, however, that Wisconsin does not have a doctrine of constructive compliance; it requires strict performance of all statutory conditions to recovering on a contract with the state. Wis. Stat. §893.82(2m); *Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 116, 595 N.W.2d 392, 399 (1999) (treating this statute as jurisdictional and therefore not amenable to exceptions or excuses).

As for the choice between declaratory judgment and an injunction: that's a matter left to the district judge's discretion, see *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), which was not abused. A declaratory judgment cannot be enforced by contempt proceedings, but it has the same effect as an injunction in fixing the parties' legal entitlements. See *Steffel v. Thompson*, 415 U.S. 452, 466–71 (1974). Badger Catholic fears that the University will attempt to dance around the declaratory judgment, as it has retreated from its assurance to the Supreme Court in *Southworth* that the program is implemented without regard to the speakers' views. A litigant who tries to evade a federal court's judgment—and a declaratory judgment is a real judgment, not just a bit of friendly advice—will come to regret it. The problem with issuing an injunction straight off is that the details required by Fed. R. Civ. P. 65(d)(1)(C) would be considerably more elaborate than the terms of a declaratory judgment. The district judge was not looking for an opportunity to take over management of the University's activity-fee program. If the entry of a regulatory injunction can be avoided by a simpler declaratory judgment, everyone comes out ahead. See *Horne v. Flores*, 129 S. Ct. 2579, 2593–95 (2009) (discouraging the use of regulatory injunctions in litigation against parts of state government). If Badger Catholic's fears come to pass, then more relief lies in store. For now, however, a declaratory judgment suffices.

AFFIRMED

WILLIAMS, *Circuit Judge*, dissenting.  The University of Wisconsin at Madison has created a forum by designating funds with the goal of enhancing the educational and extracurricular experience of its students. The line it has drawn in defining the limits of its forum is viewpoint neutral and constitutionally sound—it neutrally allows each student group equal access to the student fund as long as the group identifies activities that are reasonably within the goals of the limited forum it has created. Because I believe the panel's opinion fails to recognize the University's power to define the purposes and goals of its own forum, I respectfully dissent.

**I.**

As an initial matter, I believe it is important to set out a brief background on forum analysis and Free Speech, and to be absolutely clear on what the University will and will not fund and where it draws the line. The Constitution does not guarantee an unlimited freedom for private speakers on government property, and sorts government properties into three categories to determine the level of review: traditionally public fora, designated public fora, and limited public fora. *Christian Legal Society v. Martinez*, 130 S. Ct. 2971, 2983 n.11 (2010); *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008). Speakers may only be excluded from a traditionally public forum such as a park or a public street if the exclusion meets strict scrutiny. *Choose Life Ill., Inc.*, 547 F.3d at 864 (citations omitted). Strict scrutiny also applies when a governmental entity creates a "designated

public forum" by intentionally opening a nontraditional space for public discourse. *Id.* The third category of fora is the limited public forum, in which the governmental entity opens property for the use by certain groups or dedicated to the discussion of certain subjects. *Id.* In this limited forum, content discrimination against entire subject matters is permissible when it preserves the purpose of the forum, but viewpoint discrimination is not permitted against speech otherwise within the forum's limits. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995). A student activity fee such as the one here undisputedly creates a limited public forum, *Christian Legal Society*, 130 S. Ct. at 2984, and not a generally open one.

The University's forum funds activities that enhance the students' educational and extracurricular campus experiences. The panel begins by stating that the University must reimburse Badger Catholic's activities on the same basis it reimburses other student groups. And it does, irrespective of the group's religious perspective. The panel is correct that the University offers funding for training workshops during the school year and summer breaks, but Badger Catholic is also free to access that funding and it has. For example, in the 2007-08 year, Badger Catholic was reimbursed for events titled "Leadership Training Group" and "Mary House Overnight." Badger Catholic is also free to access funding that is provided to student groups that offer student counseling. Just as Sex Out Loud could access the forum to counsel students on "health sexuality," Badger Catholic could access the forum for activities that counseled students

from a religious perspective. In the 2007-08 year, Badger Catholic was reimbursed for various small groups such as "Breakfast Club," "Catholic Student Union," "New Student Welcome" and "Sunday Night Sexuality."

The University pointedly does not exclude events or activities from the forum because they approach leadership training or counseling from a religious perspective. In fact, Badger Catholic was reimbursed for the vast majority of the funding it sought in the relevant year, an amount of money totaling 9% of the total fund. What the University has not funded are six activities that do not merely involve, but are mostly "worship, proselytizing or prayer" because those activities do not further the forum's goals. Our task is to determine whether this line is both viewpoint neutral and reasonable in light of the forum's purpose of enhancing the students' educational and extracurricular campus experience.

## II.

As the panel notes, the Supreme Court recently had the opportunity to revisit and summarize its jurisprudence on the limited public forum in *Christian Legal Society v. Martinez*, 130 S. Ct. 2971 (2010). I cannot agree, however, with the panel's conclusion that "there can be no doubt" that *Christian Legal Society* decides the issue here and believe it is worth taking time to discuss the Court's approach to and application of the limited public forum analysis in a public university setting.

In *Christian Legal Society*, the Court discussed the progression of the law in three cases that define the current limitations on a public university's limited forum. In *Healy v. James*, 408 U.S. 169 (1972), the Court held that a public educational institution exceeds constitutional bounds when it restricts speech simply because it finds the views expressed by a group to be abhorrent. Then, in *Widmar v. Vincent*, 454 U.S. 263 (1981), the Court relied on *Healy* and held that a university could not single out religious organizations for disadvantageous treatment as compared to the treatment offered to secular groups. In reaching this holding, the Court emphasized that a "university's mission is educational and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar*, 454 U.S. at 268. Finally, in *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), the Court held that the school had selected journalistic efforts with religious editorial viewpoints and impermissibly treated them differently than other journalistic efforts. Put concisely, the Court's position after the *Healy, Widmar,* and *Rosenberger* line of cases stands for the idea that "a university generally may not withhold benefits from student groups because of their [] outlook." *Christian Legal Society*, 130 S. Ct. at 2988. The states retain the right to preserve the property under their control, however, and they can prevent access to a self-created forum, as long as "any access barrier" is "reasonable and viewpoint neutral." *Id.* at 2983.

The panel principally relies on *Widmar*, but it is important to clarify the circumstances in which that case arose. Under an Establishment Clause analysis, *Widmar* held that there is no constitutional problem if a school, with a "generally open" forum, allows a religious group to use a room on a basis open to every other group. *Widmar*, 454 U.S. at 274-75. In *Widmar*, the Court emphasized the University's creation of a "generally open" forum, *id.* at 267-68, and specifically stated that the basis for its decision was "narrow," *id.* at 276. Because it viewed the forum as being akin to a public park, it applied a strict scrutiny analysis in finding that the state's interest was not sufficiently compelling to exclude religious groups where all other student groups had access. *Id.* at 269-70. The *Widmar* Court did refer to the university-created forum as a "limited public forum" in passing, *id.* at 272, but the Court confirmed that it was a case involving restricted access to a public forum in the next year, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46, 49 n.9 (1983). The Supreme Court's forum analysis has evolved greatly since then, and now, governmental entities can block access to a limited public forum as long as the neutral barrier is viewpoint neutral. *Christian Legal Society*, 130 S. Ct. at 2983.

The panel reaches its conclusion that the University is engaging in viewpoint discrimination by stating that purely religious activities have "little meaning on their own" and cannot be meaningfully distinguished from the categories of "dialog, discussion or debate from a religious perspective" funded by the University. Op. at 3.

This conclusion degrades religion and the practice of religion. *See Bronx Household of Faith v. Bd of Educ.*, 492 F.3d 89, 102 (2d Cir. 2007) (Calabresi, J., concurring) ("Prayer and worship services are not religious viewpoints on the subjects addressed in Boy Scout Rituals or in Elks Club ceremonies. Worship is adoration, not ritual; and any other characterization of it is both profoundly demeaning and false."). If religion, and the practice of one's religion, can be described as merely dialog or debate from a religious perspective, what work does the Free Exercise clause of the First Amendment do? The Free Speech clause, which provides constitutional protection of the right to discuss and debate views, would sufficiently protect the right of people to have "dialog, discussion or debate from a religious perspective." That cannot be right, and that religion is not set apart from other forms of dialog or discussion has never been the position of the Supreme Court. *See Sch. Dist. of Abington Township v. Schemmp*, 374 U.S. 203, 217-218 (1963) (discussing the importance of the First Amendment's Free Exercise clause); *Everson v. Board of Education*, 330 U.S. 1, 9-13 (1947) (discussing the history of the First Amendment and religious liberty in America).

Moreover, there is no need to get into a theological debate about what worship means and whether there is truly a secular equivalent to worship. The University does not deny money to Badger Catholic for expressing the Catholic version of worship; it denies money to any group to practice its version of worship. If, as Badger Catholic claimed at oral argument, a secular form of worship is possible (for example, a group self-identifies

as "worshipping" the Yankees), then the University would have the same neutral basis for declining to fund that specific worship activity. As should be clear by now, I have no argument and agree wholeheartedly with the Supreme Court's understanding and view that religion can be a perspective or lens for discussing permissible topics. *Good News Club*, 533 U.S. at 111 ("[W]hat matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty or patriotism by other associations *to provide a foundation for their lessons*.") (emphasis added); *Rosenberger*, 515 U.S. at 831 ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subject discussed were otherwise within the approved category of publications.").

The constitutional question, however, is whether the University is disallowing groups to express a particular view on a permissible forum topic or whether it is disallowing groups to express any view on a particular topic. The former is unconstitutional viewpoint discrimination, the latter is constitutionally-permitted content discrimination. And content discrimination is what the University is engaging in here by not funding any worship. The category can be discussed and considered from many standpoints and perspectives, as it always has been. *See, e.g, Zelman v. Simmons-Harris*, 536 U.S. 639,

723 (2002) (Breyer, J., dissenting) (observing that this country boasts more than 55 different religious groups with a significant number of members); *Sch. Dist. of Abington Township v. Schemmp*, 374 U.S. 203, 214 (1963) ("Today authorities list 83 separate religious bodies . . . ."). The University is not withholding benefits from Badger Catholic because it has a religious perspective. Badger Catholic would only have a claim of viewpoint discrimination if the University was choosing to allocate funding for Presbyterian or Baptist or Jewish religious services but declining to fund Catholic worship services, for example, but that is not the case here.

Of course, excluding purely religious practices as a permissible use in the forum has a disparate impact on religious groups, as they may be the only groups who would wish to use the forum for worship. But, it is a "basic tenet of First Amendment law" that disparate impact does not, in itself, constitute viewpoint discrimination. *Christian Legal Society*, 130 S. Ct. at 2971. And forcing the forum to be open to purely religious activities would have the converse effect of disparately impacting non-religious student groups. As the panel states, this is what the Constitution forbids: "withholding support of religious speech *when equivalent secular speech* is funded is a form of forbidden viewpoint discrimination." Op. at 6-7 (citing *Rosenberger*, 515 U.S. at 828-30) (emphasis added). Here, there is no equivalent secular speech funded. To exclude purely religious activities is a categorical, neutral exclusion.

The limited forum here is meant to further the educational and extracurricular experience of students, and

the forum is limited by the amount of money in the fund. The University has the discretion to decide that certain activities are worth funding over others, so long as its decision-making criteria is viewpoint neutral. As its funds are limited, it is forced to make these decisions all the time, and generally, these decisions do not take on a constitutional dimension even if one group is denied funding. *Cf. Widmar*, 454 U.S. at 278-79 (Stevens, J., concurring) ("[I]f two groups of 25 students requested the use of a room at a particular time—one to view Mickey Mouse cartoons and the other to rehearse an amateur performance of Hamlet—the *First Amendment* would not require that the room be reserved for the group that submitted its application first."). Although a University cannot systematically deny or discriminate against any group for its views, it can draw lines and make hard decisions about funding. Given the limits and goals of the forum, the University's decision to draw that line at a category such as purely religious activity is not unconstitutional. Our task is merely to decide whether that decision was viewpoint neutral, and it was. As Justice Stevens stated when discussing the registered student organization program at Hastings:

> The RSO forum is no different. It is not an open commons that Hastings happens to maintain. It is a mechanism through which Hastings confers certain benefits and pursues certain aspects of its educational mission. Having exercised its discretion to establish an RSO program, a university must treat all participants evenhandedly. But the university need not remain neutral—indeed

> it could not remain neutral—in determining which goals the program will serve and which rules are best suited to facilitate those goals. There are not legal questions but policy questions; they are not for the Court but for the university to make.

*Christian Legal Society*, 130 S. Ct. at 2998 (Stevens, J., concurring).

The problem, if any, with excluding worship as a category of speech from its forum would lie in how the University and its fund administrators decide which activities constitute "purely religious activity" and which activities use a religious perspective to approach a more generally accessible purpose. *See Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 918 n.18 (9th Cir. 2007) (discussing the "specter of inevitable government entanglement" when the county "encounters some future application who is less than candid" about its reasons for accessing the forum). The University must allow religious student organizations to tackle issues and debates from their religious perspective, and it recognizes the difficulty in trying to decide which activities include prayer and proselytizing and worship and which activities are pure religious practice. But, contrary to the panel's repeated assertion that the University itself has labeled certain activities as off-limits, the University plays no role in labeling activities. Nor has it refused to pay for activities simply because they "feature prayer." Op. at 8. It instead asks the student groups to self-identify those activities that are worship, proselytizing, and prayer and then it only declines to

fund such activities. There is no dispute here that the only funds Badger Catholic argues it should have received are those it described to the University when it first requested funding as involving worship, proselytizing, and prayer. The University even acknowledges that Badger Catholic could describe Catholic Mass as "Catholic perspectives on the world," and that would probably be funded, because the University does not test or push the group when it self-defines an activity. But, when a group self-identifies an act and elevates it as worship, then the University rightly respects that.

The funding in dispute is not money that is being used to program events for the campus, for the organization's members, or for overhead costs of keeping the group running or recruiting new members. This is money for items self-described as including Mass, the purchase and distribution of rosary booklets, a retreat described as an Evangelical Catholic Institute to train attendees how to evangelize, and private sessions with visiting priests and nuns from Italy.

The self-identification also takes care of a problem that the panel sees with Quakers, Buddhists, and other religions that see no line between religion and daily life. If the campus Quakers put in a request to have their worship reimbursed, the University would decline to fund that request. If on the other hand, the Quakers described their activity as a discussion with the hopes of coming to a consensus (*see* Op. at 11-12), they would have access to the forum. This decision is left to the group, and thus, respects the ability of groups to define and practice their religions. Under the panel's view, once a

public university has created a forum, there is no way for it to constitutionally limit its forum to anything; it becomes a generally open forum. It must now fund the worship activities of every group, which opens the forum to funding requests for the day-to-day activities of those groups who believe day-to-day activities constitute worship. The panel has effectively commanded the University to enlarge its forum to include the worship and other purely religious activities of every student group.

My belief that the category of "purely religious activity" is viewpoint neutral is not a call for return to a strict separation between church and state. *See* John Witte, Jr., *That Serpentine Wall of Separation*, 101 Mich. L. Rev. 1869, 1903 (2003) (remarking on the Supreme Court shift from a "wall of separation" between church and state to other principles of religious liberty such as neutrality and accommodations). It instead reflects an understanding that the University has made a choice to limit its forum, in a constitutionally acceptable matter, by not allowing a group access to the fund in a way that is not accessible to every group. The Supreme Court has stated that when access barriers are viewpoint neutral, it is significant that "other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers." *Christian Legal Society*, 130 S. Ct. at 2991. Here, the barrier does not create any barrier for Badger Catholic and other student groups to exercise their First Amendment rights. And contrary to the panel's suggestion that it may not be able to believe the University when it tells us it will fund discussions with

religious components, Op. at 11, we can, because the University does, and it generously does so. The vast majority of the services and educational opportunities that Badger Catholic, for example, provides are funded by the University, to the tune of some $200,000 per year.

The forum the University has created is viewpoint neutral and reasonable, and that satisfies its constitutional obligations. As Justice Ginsburg pointed out in *Christian Legal Society*, "[o]ur inquiry is shaped by the educational context in which it arises" and judges should "resist substituting their own notions of sound educational policy for those of the school authorities which they review." 130 S. Ct. at 2988 (internal quotations and citations omitted). She continues, "Schools, we have emphasized, enjoy a significant measure of authority over the type of officially recognized activities in which their students participate." *Id.* at 2989. With deference to the school's attempt to distribute limited funds from a student body restless with the continuously increasing tuition and fees, it is reasonable that the school in this case decided that if a group self-identifies activities as worship, the University will not inquire further. It will simply not fund, gift or contribute to that which the group has self-identified as being outside the limits of the public forum the school has created.

## III.

The panel also states that the University would not violate the Establishment Clause by funding Badger

Catholic's purely religious activities. Op. at 9. I agree with the panel that this is true, because a state can choose to create an unlimited public forum, *Pleasant Grove City v. Summum*, 129 S. Ct. 1125 (2009), and this would pass the well-known test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Generally speaking, a state would not violate the Establishment Clause by opening such a forum because the forum would have the secular purpose of enhancing the educational experience of its students, it would not have the primary effect of advancing or inhibiting religion, and it would not result in excessive government entanglement with religion. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002); *Lemon*, 403 U.S. at 612-13. But, this conclusion does not help us decide whether or not the University's limited forum is viewpoint neutral and reasonable. That a state can *choose* to fund this category of speech does not create an *obligation* for it to do so. *Locke v. Davey*, 540 U.S. 712, 719 (2004) ("There are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause."). The *Lemon* test is, after all, a test of exclusion—it determines whether a state action violates the Establishment Clause, and holds no position on state *in*action.

The Establishment Clause cases referenced by the panel do nothing but support this reading. For example, *Zelman* holds that "states *may* allow school vouchers to be used at religious schools without violating the Constitution." Op. at 9 (emphasis added). This holding does not have any bearing on the initial question of whether a school district must provide parents with vouchers.

It also does not stand for the proposition that a school district which does provide vouchers must allow vouchers to be used at religious schools. Its limited holding states that such a program, with such a choice, does not violate the Establishment Clause. *Zelman*, 536 U.S. at 653.

*Locke v. Davey* offers even more support to this reading. 540 U.S. at 719. *Locke* reaffirmed that the Free Exercise Clause does not impose an affirmative obligation on the state to fund all religious activities of an organization simply because it has chosen to fund activities of its secular counterparts. *Locke*, 540 U.S. at 721. The panel may criticize the state's decision to engage in this type of selective funding, Op. at 9, but it is a permissible constitutional choice. The University had done nothing to block Badger Catholic's or any other group's right to practice its religion. It has chosen instead to take a neutral stance on that core constitutional right, which preserves the purpose of the forum (enhancing educational and extracurricular experiences) without providing additional benefits to those who choose to engage in religious practices as opposed to those who do not.

Though the Establishment Clause might allow the University to fund the activities in dispute if it chose to neutrally fund all such purely religious practices by all groups, it does not require the University to do so merely because it has created a forum. And, choosing to have created a forum for the purpose of enhancing students' educational experience should not obligate the

University to directly fund religious institutions. The University maintains the power and discretion to control the purposes and goals of its fund and to designate the class of speech that is within the forum. The broad category of purely religious practices, with the endless number of perspectives with which to view that category, is a viewpoint neutral access barrier, and to find otherwise would be to hold that universities have no power to limit their forums to further the forum's goals and purposes.

## IV.

The University has acknowledged how difficult it has been to delineate a line between funding all activities and making sure to be viewpoint neutral. I commend its efforts and believe the line it has drawn is a constitutional one. It has drawn this line with an eye to its state constitution and its educational mission. Our review should only be of whether that line creates a neutral barrier or if it discriminates based on viewpoint. Purely religious practices, as self-defined by the student group, is certainly a viewpoint neutral, category of speech. To fund every group's varying approaches to their core religious practices would burden the forum and its purposes to the point of making it impossible to administer. Excluding this category of speech from the forum is a neutral barrier as it restricts Badger Catholic's ability to access the forum on the same basis as it restricts the ability of other religious and nonreligious student groups, such as Sex Out Loud, Jewish Cultural Collec-

tive, and MultiCultural Student Coalition to use the forum. The University has created a neutral barrier in precluding the use of its limited forum for purely religious practice. This neutral barrier is reasonable in light of the forum's educational mission, and it, in my view, is constitutional.