In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1535

ILLINOIS DUNESLAND PRESERVATION SOCIETY,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF NATURAL RESOURCES, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2880—**Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 11, 2009—DECIDED OCTOBER 14, 2009

Before EASTERBROOK, *Chief Judge*, and POSNER and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge.* Illinois Beach State Park is a large state park abutting Lake Michigan in northeastern Illinois; it attracts upward of two million visitors in some years. The plaintiff, a nonprofit corporation that helped to create and continues to support the park, filed this suit under 42 U.S.C. § 1983 against state officials

involved in its management and the state agency that operates the park, charging infringement of free speech. The agency was properly dismissed because states are not "persons" within the meaning of section 1983 and so cannot be sued under that section. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-66 (1989). And because damages suits against state officials in their official capacity are deemed suits against the state, the claims against the defendant officials in their official capacity for declaratory relief were also properly dismissed because the plaintiff's only purpose in seeking such relief in this case was to establish liability for the past infringement of its rights so as to entitle it to damages. *Green v. Mansour*, 474 U.S. 64, 73 (1985). Those officials are also sued in their personal capacity, however, and in that capacity are "persons" within the meaning of section 1983. But the district judge granted summary judgment in their favor; and so the entire suit was dismissed.

The defendants refused to display in the display racks in various buildings in the park a scary two-page pamphlet that the plaintiff had prepared. Entitled "Tips for Avoiding Asbestos Contamination at Illinois Beach State Park," the pamphlet recommends "commonsense approaches . . . for minimizing exposure to you and your family from asbestos contamination while at the beaches of Illinois Beach State Park." It warns that "many pieces of asbestos have been tumbling along the shoreline for years," that "microscopic asbestos can be released from the sand when agitated," and that "disturbing the sand can cause asbestos to become airborne." And since "asbestos fibers can be found wherever beach sand can go," the

reader is advised to "wash your whole body including hair, ears, and under fingernails. Pets should also be washed down prior to leaving the beach . . . . Take care when shaking out towels and blankets that may have come into contact with sand. Remove all beach clothing prior to entering your car or home. Launder beach clothing, blankets, and towels separately. Store shoes and other hard to clean items outside of the home."

The park's numerous display racks contain a variety of brochures and flyers selected by park officials. Some of these are produced by the park itself and are guides to the park or lists of nearby resorts. Some are maps; some, government warnings about pathogens. There are also brochures advertising such draws in the area as an amusement park, a mall, a petting zoo, a store that sells supplies for fishermen, and other sites that might interest tourists.

The beaches do contain asbestos fibers, possibly as a result of the park's adjacency to a site on which Johns-Manville once manufactured building materials containing asbestos; another potential source is beachfront homes that contained asbestos and long ago washed into the lake. But studies of the beaches by federal and state agencies have not found levels of asbestos sufficient to menace human health. U.S. Dept. of Health & Human Services, Agency for Toxic Substances and Disease Registry, "Health Consultation, Exposure Investigation Report on Illinois Beach State Park" (Oct. 19, 2007), www.atsdr.cdc.gov/HAC/pha/IllinoisBeachStatePark/ IllinoisBeachStatePark(EI)HC101907.pdf; Illinois Dept. of

Public Health, "Public Health Assessment, Asbestos Contamination at Illinois Beach State Park" (May 23, 2000), www.atsdr.cdc.gov/HAC/pha/illinoisbeach/ibp_toc.html; see also University of Illinois, Center of Excellence in Environmental Health, "Illinois Beach State Park (IBSP): Determination of Asbestos Contamination in Beach Nourishment Sand" (June 20, 2006), www.uic.edu/sph/glakes/coe/IBSP_Sand_Final_Report1_wo_App.pdf. (All these websites were visited on September 21, 2009.) The park's staff does try, however, to remove from the beaches material that contains or might contain asbestos.

The asbestos at the Illinois Beach State Park has attracted the attention of the media, e.g., Carol Marin & Don Moseley, "It's Not Child's Play; Material Containing Carcinogen Found This Week in Sand Castle at Illinois Beach State Park," *Chicago Sun-Times*, Aug. 2, 2007, p. 3 ("material containing asbestos, a known carcinogen, was found this week wedged in one of the most innocent symbols of summer: a sand castle at the water's edge of Illinois Beach State Park"); Dan Rozek, "More Asbestos Found at Zion Park," *Chicago Sun-Times*, July 2, 2004, p. 21; Dave McKinney, "State Agency Shuts Out Environmental Watchdog at Nature Sanctuary; Dunesland Group Recently Found Asbestos in Preserve," *Chicago Sun-Times*, July 31, 2003, p. 18; Douglas Holt, "State to Investigate Safety at Zion Park; Asbestos Fears Fuel Madigan Action," *Chicago Tribune*, July 3, 2003, p. 1. And until 2004 the racks displayed a "fact sheet," which is in the record, about asbestos in the park that had been prepared by state environmental and health agencies. But that year the supply of copies of the fact sheet ran out. The defen-

dants say in their brief that they prepared and displayed new fact sheets in 2005 and again in 2006, but these are not in the record and we do not know what their content is or was. The fact sheet that is in the record acknowledged the presence of low levels of asbestos in the park's beaches but denied that they were a health hazard. It is as anodyne as the plaintiff's pamphlet is alarming.

Lawyers in federal appeals invariably frame their arguments in language taken from Supreme Court opinions. In this case, which involves a First Amendment issue, the lawyers have treated us to a barrage of unhelpful First Amendment jargon.

A "forum" in that jargon is a piece of public property usable for expressive activity by members of the public ("private speech," in forum jargon). The Supreme Court distinguishes a "traditional public forum" from a "designated public forum" and both from a "nonpublic forum." E.g., *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009); *Good News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001); *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992); *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983).

A traditional public forum is a street or park, or some other type of public property that like a street or park has long ("time out of mind," as some cases put it, or "from time immemorial," as others say) been used for expressive activity, such as marches and leafletting. A designated public forum, illustrated by a public theater,

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975); *Gilles v. Blanchard*, 477 F.3d 466, 473 (7th Cir. 2007); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 565, 570-71 (9th Cir. 1984), is a facility that the government has created to be, or has subsequently opened for use as, a site for expressive activity by private persons. Usually, as in the case of a public theater, it is available only for specified forms of private expressive activity: plays, in the case of a theater, rather than political speeches. Such limitations are permitted; the public owner of a theater need not throw it open for political rallies even though it is physically capable of being so used. But the owner is not allowed to discriminate among the plays performed in the theater on the basis of the ideas or opinions that the plays express, as appeared to have happened in the *Southeastern Promotions* case.

The third category—the "nonpublic forum"—consists of government-owned facilities like the Justice Department's auditorium that could be and sometimes are used for private expressive activities but are not primarily intended for such use. The government can limit private expression in such a facility to expression that furthers the purpose for which the facility was created. E.g., *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 677-80 (1998); *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 804-806 (1985).

Some decisions recognize a fourth category, a variant of the second, variously called a "limited designated public forum" (what Shakespeare's Polonius would have

called "a vile phrase"), a "limited public forum," or a "limited forum." *Pleasant Grove City v. Summum, supra,* 129 S. Ct. at 1132; *Perry Education Ass'n v. Perry Local Educators' Ass'n, supra,* 460 U.S. at 46 n. 7; *Good News Club v. Milford Central School, supra,* 533 U.S. at 106-07; *Gilles v. Blanchard, supra,* 477 F.3d 466, 473-74; *Nurre v. Whitehead,* 2009 WL 2857196, at *4 (9th Cir. Sept. 8, 2009); *Steinburg v. Chesterfield County Planning Comm'n,* 527 F.3d 377, 384-85 (4th Cir. 2008); *Bowman v. White,* 444 F.3d 967, 975-76 (8th Cir. 2006); *Husain v. Springer,* 494 F.3d 108, 127-28 (2d Cir. 2007). The terms denote a public facility limited to the discussion of certain subjects or reserved for some types or classes of speaker. In *Gilles* it was an open space in a state university in which members of the university community and their guests—but not uninvited outsiders—were allowed to give talks.

It is difficult to see what difference there is between such restrictions and the selection that the director of a state theater has to make among theater groups clamoring for access to the stage. Indeed it is rather difficult to see what work "forum analysis" in general does. It is obvious both that every public site of private expression has to be regulated to some extent and that the character of permitted regulation will vary with the differences among the different types of site. Street demonstrations have to be regulated to prevent blocking traffic, and the use of a state theater has to be regulated to ration the use of a limited facility and maintain quality, and obviously the regulations will be very different. The constant (applicable even to nonpublic forums, *Cornelius v. NAACP Legal Defense & Educational Fund, Inc., supra,*

473 U.S. at 800, 806) is that regulation is not to be used as a weapon to stifle speech.

The district judge thought that the display racks in the Illinois Beach State Park are not a public forum but instead are "a mini-library of resources for the public, and [the park's management] necessarily made 'editorial' judgments about which materials to include." Indeed there are cases that say that "forum analysis" does not apply to public libraries. *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality opinion); see also *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005); cf. *National Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998); *Arkansas Educational Television Comm'n v. Forbes*, *supra*, 523 U.S. at 672-74. But what is the relevant difference between a state theater (a "designated public forum") and a public library, or the public-college art gallery in *Piarowski v. Illinois Community College Dist. 515*, 759 F.2d 625 (7th Cir. 1985)? In all three cases the management of a government facility has to decide which playwright's or author's or artist's work will be allowed to be exhibited, in view of the site's limited capacity.

The defendants argue that "forum analysis" is inapplicable (more precisely, that it does not support the plaintiff's claim) because the materials in the display racks are "government speech." This term would be readily intelligible if it referred just to situations in which a government official made a statement; he would not be required to contradict himself by including a counterstatement urged by a private person. See *Pleasant*

*Grove City v. Summum, supra*, 129 S. Ct. at 1131; *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 833 (1995); *Rust v. Sullivan*, 500 U.S. 173, 192-93 (1991); *Keller v. State Bar of California*, 496 U.S. 1, 12-13 (1990); *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 859 (7th Cir. 2008); *Page v. Lexington County School Dist. One*, 531 F.3d 275, 280-81 (4th Cir. 2008). That would have been the precise situation here had the park display racks still contained the old fact sheet when the plaintiff sought access to the racks for its frightening pamphlet. Most people who read and believed the plaintiff's pamphlet would flee the park forthwith. We don't know what the current fact sheet says, though it must be less alarmist than the plaintiff's, or the park officials wouldn't have excluded the plaintiff's.

But it wouldn't matter if there were no government fact sheet, hence no "government speech" in the literal sense. For there was none in *Summum* either, and it is the leading case on "government speech." A city had accepted a Ten Commandments monument donated to it for display in the city's park and had turned down a monument offered to the city by a Gnostic sect. The Court held that the monument selected by the city was the vehicle of the city's expression, just as playing the national anthem at an official function is government expression even though the anthem was composed by a private person.

The materials chosen for the display racks in the Illinois Beach State Park are designed to attract people to the park, and more broadly to Illinois tourist facilities and

services. The choice of materials conveys a message that is contradicted by the plaintiff's pamphlet. The message of the publications in the display racks is: come to the park and have a great time on the sandy beaches. The message of the plaintiff's pamphlet is: you think you're in a nice park but really you're in Chernobyl, so if you're dumb enough to come here be sure not to step on the sand because that would disturb or agitate it, and to scrub under your fingernails as soon as you get home.

The defendants could avoid giving the appearance of endorsing an opinion that they do not believe by resurrecting their old fact sheet and placing it next to the plaintiff's pamphlet in the display racks. But the mere display of that pamphlet would give it a legitimacy, a weight, that the defendants are not obliged to acknowledge; it would suggest that the park had little confidence in its denial that there was any real asbestos danger. The display rack would soon be crowded with angry pamphlets by environmental activists, and rejoinders by park and other state officials.

Which brings us to the compelling practical objections to the plaintiff's position. Display racks crammed with brochures and pamphlets are omnipresent in public property in the United States, not only parks and other areas of public recreation but also turnpike service plazas and the lobbies of government buildings. If the plaintiff's conception of freedom of speech prevailed, every clerk responsible for stocking such a display rack would face a potential First Amendment suit by an interest group that wanted to influence government

action or public opinion. Must every public display rack exhibit on demand pamphlets advocating nudism, warning that the world will end in 2012 (see Lawrence E. Joseph, *Apocalypse 2012: An Investigation into Civilization's End* (2007)), reciting the "Seven Aphorisms of Summum" (the title of the plaintiff's monument in the *Summum* case), or proclaiming the unconstitutionality of the income tax, together with pamphlets expressing the opposing view on all these subjects? Or (contrary to the recent ruling in *Sutliffe v. Epping School Dist.*, 2009 WL 2973115, at *14 (1st Cir. Sept. 17, 2009)) must the park on request link its online home page to every website of an organization or a person who would like to express an opinion on asbestos fibers or any other topic that might relate to Illinois Beach State Park? We can guess what the effect of the position urged by the plaintiff in this case would be: no more display racks on public property; no more home pages for public agencies. See *Pleasant Grove City v. Summum*, *supra*, 129 S. Ct. at 1138; *Sutliffe v. Epping School District*, *supra*, 2009 WL 2973115, at *17 ("the Town has created a website with the intended purpose to convey information about itself to its citizens and others, and it has added a limited number of hyperlinks to external sites . . . in order to further this purpose. The public forum doctrine could risk flooding the Town website with private links, thus making it impossible for the Town to effectively convey its own message and defeating the very purpose of the website and hyperlinks chosen by the Town"). We can avoid that end by avoiding this beginning.

It is not as if the denial of rack space had closed off the only good avenue that the plaintiff has for reaching the

patrons of the state park with its message. At argument the plaintiff's lawyer, repeating an unelaborated statement in his brief, said his client would need a "demonstration permit" in order to be allowed to hand out pamphlets at the entrances to, or sites within, the park, and implied that such a permit might be difficult to obtain. One of the park officials had told him that applying for such a permit "was a potential avenue for the Dunesland Society to access the park in a way that might be able to get their message out." But he didn't say it was the only way, and the district judge noted that the plaintiff "did not seek to distribute its flyer within the Park by any means other than inclusion in the display racks." The judge added that "no special permit or license is required to hand out pamphlets to Park visitors." The park authorities cannot impose unreasonable barriers to using open public space to convey ideas and opinions (remember that a park is "a traditional public forum"), but there has been no showing that they've tried to do this.

AFFIRMED.