EASTERBROOK, Chief Judge.
The University of Wisconsin at Madison charges every student a fee, which goes into funds for extracurricular activities. The fund dedicated to student services (such as counseling and tutoring) distributes about $2.5 million annually. Many of the recipients use the money to offset the costs of speech: funded organizations include FH King (which promotes sustainable agriculture), the Multicultural Student Coalition (which promotes “social justice and the principles of unity, integrity, responsibility, and respect”), and Sex Out Loud (which promotes “healthy sexuality”). When some students objected to paying for other students’ speech, the University defended its program as creating a public forum that advances its academic mission using viewpoint-neutral criteria. The Supreme Court accepted this assurance that funds are distributed without regard to the speakers’ perspectives and concluded that a neutral, forum-creating program could be funded by a uniform fee collected from each student. University of Wisconsin v. Southworth, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000).
Among the applicants for funds at the University’s Madison campus is a student organization that, when it applied for recognition as a “registered student organization” eligible for money, was known as the University of Wisconsin Roman Catholic Foundation. In 2007 it changed its name to Roman Catholic Foundation, UW-Madison. Last year the group became Badger Catholic. We use the current name, which has the virtue of brevity if not stability. Badger Catholic’s application for student-organization status was rejected because its members and officers included some nonstudents, such as a bishop. A reorga *777 nization eventually satisfied the University that students are in control, and the University’s Chancellor approved Badger Catholic as a registered student organization in 2007. To be eligible for reimbursement, a group must submit a budget for the approval of student government and eventually the administration. Badger Catholic has had trouble with this process. Each budget has been rejected at least in part by the student government, the administration, or both on the ground that much of Badger Catholic’s speech is religious in character. The University won’t pay for three categories of speech: worship, proselytizing, and religious instruction. It is willing to use student activity fees for what it calls dialog, discussion, or debate from a religious perspective, but not for anything that it labels worship, proselytizing, or religious instruction.
These categories have little meaning on their own, but examples demonstrate where the University has drawn the line. One of the district court’s opinions sets out the six specific programs for which the University has refused to reimburse any of the group’s expenses. 590 F.Supp.2d 1083, 1088-89 (W-D.Wis.2008). One program is called “mentoring for busy students” and entails meetings between students and “one of the spiritual directors for spiritual mentoring/counseling and to talk about anything they wanted for a half-hour. The spiritual directors included Catholic nuns and priests who would offer guidance or prayer if requested by the student.” Another program was a summer retreat for leadership training. During the four-day retreat, three masses were said and four communal prayer sessions held.
Although the University promised the Supreme Court in Southworth to distribute funds without regard to the content and viewpoint of the students’ speech, it has concluded that this promise does not apply to speech that constitutes the practice of religion. In response to Badger Catholic’s suit under 42 U.S.C. § 1983, the University (as we call the defendants collectively) contended that funding for prayer, proselytizing, or religious instruction would violate the Establishment Clause of the First Amendment (applied to the states through the Fourteenth Amendment), and that the obligation not to violate the Constitution is a compelling interest that justifies a departure from neutrality. The district court concluded, however, that reimbursing the expenses of religious speakers, through a program equally available to secular speakers, does not violate the Establishment Clause, and that, having established a public forum (which is how Southworth treats the student-fee program), the University must not exclude speakers who want to use the forum for worship. 578 F.Supp.2d 1121 (W.D.Wis.2008), reconsideration denied, 590 F.Supp.2d 1083 (W.D.Wis.2008).
The court entered a declaratory judgment providing that the University must reimburse Badger Catholic’s activities on the same basis as it reimburses other student groups. The University is free to decline funding for all summer retreats; if it does not pay for training workshops over the summer for members of FH King, it need not pay for Badger Catholic’s retreats either. Likewise, if the University refuses to fund a group such as Sex Out Loud that counsels students to engage in “healthy sexuality” (and distributes contraceptives to reduce the risk), it need not fund a group that counsels from a religious perspective. If the University decides that no student group should receive more than 1% of the fund, or some dollar cap, it could apply that neutral rule to Badger Catholic in common with all other claimants on the limited pot. But having decided that counseling programs are within the scope of the activity fee, the University *778 cannot exclude those that offer prayer as one means of relieving the anxiety that many students experience.
The district court correctly read the Supreme Court’s decisions in holding that the University would not violate the Establishment Clause by funding Badger Catholic’s programs. Two decisions in particular — Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and Rosenberger v. University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) — support that conclusion.
The University of Missouri at Kansas City allowed student groups to usé its facilities, but it withheld permission for a group called Cornerstone, which wanted to use a meeting room for “religious worship and religious discussion.” Widmar, 454 U.S. at 265, 102 S.Ct. 269. (Cornerstone’s normal program included “prayer, hymns, Bible commentary, and discussion of religious views and experiences”, id. at 265 n. 2, 102 S.Ct. 269.) The University of Missouri contended, just as the University of Wisconsin has done, that any subsidy to worship would violate the Establishment Clause — and it added that providing a rent-free room on campus is a subsidy as surely as the transfer of cash to pay for renting a room off campus. The Justices agreed with the premise that a free room is a form of subsidy but not with the conclusion that a subsidy violates the Establishment Clause. As long as the University makes facilities equally available to secular and sectarian groups, the Court held, there is no constitutional problem. Indeed, Widmar added, excluding a religious speaker would amount to content discrimination, which is forbidden in a public forum such as the one the University had established. Cornerstone therefore was entitled to a room where its members could meet, pray, sing hymns, and proselytize.
A decade after Widmar, the University of Virginia declined to pay for the expense of printing Wide Awake, a religious newspaper that a student group published in an effort to educate and convert other students (in other words, to proselytize). The University of Virginia conceded that this was content discrimination but contended, just as the University of Wisconsin has, that by devoting part of the student-activity fund to religious speech, it would violate the Establishment Clause. Although Widmar was seemingly against it, the University of Virginia contended that there is a difference of constitutional magnitude between providing services in kind (such as making meeting rooms available) and handing over cash or reimbursing a religious speaker’s expenses. The Supreme Court rejected that effort to distinguish Widmar, holding that cash and in-kind subsidies must be treated identically. 515 U.S. at 832-34, 115 S.Ct. 2510. And the Court reiterated Widmar’s conclusion that withholding support of religious speech when equivalent secular speech is funded is a form of forbidden viewpoint discrimination. Id. at 828-30,115 S.Ct. 2510.
Decisions since Rosenberger reinforce its conclusion that underwriting a religious speaker’s costs, as part of a neutral program justified by the program’s secular benefits, does not violate the Establishment Clause even if the religious speaker uses some of the money for prayer or sectarian instruction. One good example is Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), which held that states may allow school vouchers to be used at religious schools without violating the Constitution, when the decision about which school to attend reflects a private choice about how best to educate children. Similarly, Good News Club v. Milford Central School, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), held that a school would not violate *779 the Establishment Clause by providing facilities to a religious group, which proposed to use them for singing religious songs, praying, and memorizing scripture, when the facilities were equally available to secular groups — and Good News Club added that any departure from neutrality would be viewpoint discrimination that is forbidden in a public forum, which the school district created by allowing private groups to use its facilities. See also Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (reimbursing the tuition of a theology student does not offend the Establishment Clause, when the scholarship is part of a program that is neutral with respect to religion and the student chooses where to use the scholarship).
These decisions dispose of the University’s contention that, in refusing to fund Badger Catholic’s proposed activities, it was engaged in content discrimination rather than viewpoint discrimination. Two district judges have handled parts of this litigation. Judge Shabaz called the University’s distinction viewpoint discrimination. 2008 WL 2766267, 2008 U.S. Dist. LEXIS 4137 (W.D.Wis. Jan. 17, 2008). After the suit was transferred when Judge Shabaz stopped hearing cases, Judge Adelman called it content discrimination. 578 F.Supp.2d at 1137. Both judges thought the discrimination unconstitutional.
The Supreme Court is not always clear about the difference; in Rosenberger it said that “[viewpoint discrimination is [just] an egregious form of content discrimination.” 515 U.S. at 829, 115 S.Ct. 2510. Elsewhere it has held that content discrimination can be part of a lawful system of allocating limited funds; this is why a university could decline to pay for any retreats or counseling, if the content of the speech would place it outside the scope of the program. (One example, from Christian Legal Society v. Martinez, — U.S. -, 130 S.Ct. 2971, 2998, 177 L.Ed.2d 838 (2010) (Kennedy, J., concurring): A university can decline to pay for an art historian to address a conference devoted to public transit, because the art historian’s perspective is outside the scope of the conference.) A university can define the kind of extracurricular activity that it chooses to promote, reimbursing, say, a student-run series of silent movies and a debate team, while leaving counseling to the student-health service that the university operates itself. But the University of Wisconsin has chosen to pay for student-led counseling, and its decision to exclude counseling that features prayer is forbidden under Widmar and its successors. The label applied to that discrimination is unimportant.
Although the University’s main theme in the district court was that reimbursement would violate the Establishment Clause, its main theme on appeal is that a public agency is entitled to withhold funds from religious speech, even though not commanded by the Establishment Clause to do so. Zelman held that a state is entitled to offer school vouchers that can be cashed at sectarian schools but not that it is required to do so. Arguments such as Professor (then judge, and now professor again) McConnell’s that the Constitution requires a state to follow a principle of neutral funding have not carried the day at the Supreme Court. See Michael W. McConnell, The Selective Funding Problem: Abortions and Religious Schools, 104 Harv. L.Rev. 989 (1991).
One recent illustration of the Justices’ willingness to allow states to exclude some religious uses from public expenditures is Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). A state program of college scholarships had a proviso: the money could not be used to study for *780 the ministry. The Court held that although the state could have allowed the money to be spent for studies in devotional theology (citing Witters), the restriction was compatible with the Free Exercise Clause, because “there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause.” 540 U.S. at 719, 124 S.Ct. 1307. By choosing not to use public funds to train ministers, the state was making a choice no different from operating a university that includes a department of philosophy but not a department of theology or a seminary. The University of Wisconsin contends that it has made the sort of choice that Locke approved.
That’s not entirely right, and for two reasons. First, the Court stressed in Locke that the state’s program did not evince hostility to religion. The scholarships could be used at pervasively sectarian colleges, where prayer and devotion were part of the instructional program; only training to become a minister was off limits. 540 U.S. at 724-25, 124 S.Ct. 1307. The University of Wisconsin, by contrast, does not support programs that include prayer or religious instruction. Second, and more importantly, the state’s decision in Locke concerned how to use funds over which it had retained plenary control. Choosing which programs to support and which not, whether by having a department of philosophy but not a seminary, or by granting scholarships to study theology but not prepare for the ministry, is a form of government speech. See Pleasant Grove v. Summum, — U.S. -, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009); Illinois Dunesland Preservation Society v. Illinois Department of Natural Resources, 584 F.3d 719 (7th Cir.2009). That’s why Locke declared that public-forum analysis was “simply inapplicable.” 540 U.S. at 720 n. 3, 124 S.Ct. 1307. But the University of Wisconsin is not propagating its own message; it has created a public forum where the students, not the University, decide what is to be said. And having created a public forum, the University must honor the private choice.
Readers who think that this line is overly formalistic — selective funding as permissible public choice, versus selective funding as impermissible restriction on private choice in a public forum — must recall that the University of Wisconsin itself persuaded the Supreme Court to hold that dissatisfied students are not entitled to get their student-activity fees back, precisely because the fees are used to operate a public forum in which students themselves, and not the University, decide what is to be said. The Supreme Court gave its imprimatur in Southworth, with the proviso that the University must establish neutral rules and not shut out any perspective that is within the program’s general definition of extracurricular student activity. Just as there is a big difference between a university as publisher of its own newspaper and as censor of a student paper — the university may choose as publisher what goes into the alumni news but cannot censor a paper or selectively decline to pay where students are the publishers, see Hosty v. Carter, 412 F.3d 731 (7th Cir.2005) (en banc)—so a university cannot shape Badger Catholic’s message by selectively funding the speech it approves, but not the speech it disapproves. Once it creates a public forum, a university must accept all comers within the forum’s scope. This is why, in another decision arising from the University of Wisconsin’s fee system, we held that the University is not entitled to exercise a general discretion over which groups can draw on the funds. See Southworth v. University of Wisconsin, 307 F.3d 566 (7th Cir.2002).
The University’s assurance that it will fund discussion and debate, including discussion with a religious component, be *781 cause it views discussion and debate as an important part of education, coupled with a declaration that there is just too much devotional activity in Badger Catholic’s program, leads us to wonder how the University would deal with an application by a student group comprising members of the Society of Friends. Quakers view communal silence as religious devotion, and a discussion leading to consensus as a religious exercise. Adherents to Islam and Buddhism deny that there is any divide between religion and daily life; they see elements of worship in everything a person does. Now maybe Quakers, Muslims, and Buddhists scorn the University’s largesse (as Badger Catholic did until 2003), but a constitutional rule must be general enough to handle all sorts of religion and all choices by student groups.
We deferred action on this appeal while the Supreme Court had Christian Legal Society under advisement. It is the latest in the sequence, beginning with Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and extending through Widmar, Rosenberger, and Southworth, in which colleges or universities set limits on what student organizations they would recognize and fund. Healy, which forbade viewpoint discrimination, did not concern religion, so we have not discussed it. All the other cases in this sequence concern student groups that engage in sectarian speech. We wanted to see whether the Court would modify the approach articulated in Widmar, Rosenberger, and South-worth. The Court left that approach in place and reiterated the norm that universities must make their recognition and funding decisions without regard to the speaker’s viewpoint. The Justices divided on the question whether Hastings College of the Law had satisfied the neutrality requirement, but no Justice disagreed with the propositions that “[a]ny access barrier must be reasonable and viewpoint neutral” (130 S.Ct. at 2984) and that “singling] out religious organizations for disadvantageous treatment” (id. at 2987) is permissible only if the requirements of “strict scrutiny” can be satisfied. Christian Legal Society described Widmar as a case holding that refusing to allow “religious worship and discussion” in a public forum is forbidden viewpoint discrimination (ibid.). There can be no doubt after Christian Legal Society that the University’s activity-fee fund must cover Badger Catholic’s six contested programs, if similar programs that espouse a secular perspective are reimbursed.
This conclusion disposes of the University’s appeal. Badger Catholic has filed a cross-appeal seeking additional relief. It asked the district court for damages and an injunction; the judge awarded only a declaratory judgment. The request for damages founders on the Supreme Court’s decision that a state (including a state official sued in an official capacity) is not a “person” for the purpose of § 1983, see Will v. Michigan Department of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), which means that damages from the state treasury are not available under that statute. See, e.g., Lapides v. University System of Georgia, 535 U.S. 613, 617-18, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); Arizonans for Official English v. Arizona, 520 U.S. 43, 69, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). The University of Wisconsin is part of the state, Wis. Stat. §§ 36.01-36.62; Southworth, 529 U.S. at 221, 120 S.Ct. 1346, so damages cannot be awarded under federal law.
Badger Catholic sees two ways around this. One is damages from the defendants in their individual capacities. The district court held, however, that in this capacity the defendants enjoy the benefit of official immunity. Divided decisions such as Christian Legal Society and Locke show that this corner of the law cannot be re *782 garded as so clear that personal liability is appropriate. “If judges ... disagree on a constitutional question, it is unfair to subject [public officials] to money damages for picking the losing side of the controversy.” Wilson v. Layne, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Accord, Pearson v. Callahan, — U.S. -, 129 S.Ct. 808, 823, 172 L.Ed.2d 565 (2009).
Badger Catholic’s other avenue to damages is state law. After the University declined to reimburse some of its expenses in earlier academic years, the parties reached an agreement under which Badger Catholic’s requests would be reconsidered. Badger Catholic contends that the University has not kept its promise, and that it is entitled to compensation for breach of contract. Here its problem is that it did not give the notices required by Wisconsin law. Wis. Stat. § 16.007 (claims against the state), § 893.82(3) (claims against state employees). Badger Catholic concedes that it did not follow the state’s procedures but contends that noncompliance should be excused because the state knew what relief it wants. We agree with the district court, however, that Wisconsin does not have a doctrine of constructive compliance; it requires strict performance of all statutory conditions to recovering on a contract with the state. Wis. Stat. § 893.82(2m); Riccitelli v. Broekhuizen, 227 Wis.2d 100, 116, 595 N.W.2d 392, 399 (1999) (treating this statute as jurisdictional and therefore not amenable to exceptions or excuses).
As for the choice between declaratory judgment and an injunction: that’s a matter left to the district judge’s discretion, see eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), which was not abused. A declaratory judgment cannot be enforced by contempt proceedings, but it has the same effect as an injunction in fixing the parties’ legal entitlements. See Steffel v. Thompson, 415 U.S. 452, 466-71, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Badger Catholic fears that the University will attempt to dance around the declaratory judgment, as it has retreated from its assurance to the Supreme Court in South-worth that the program is implemented without regard to the speakers’ views. A litigant who tries to evade a federal court’s judgment — and a declaratory judgment is a real judgment, not just a bit of friendly advice — will come to regret it. The problem with issuing an injunction straight off is that the details required by Fed.R.Civ.P. 65(d)(1)(C) would be considerably more elaborate than the terms of a declaratory judgment. The district judge was not looking for an opportunity to take over management of the University’s activity-fee program. If the entry of a regulatory injunction can be avoided by a simpler declaratory judgment, everyone comes out ahead. See Horne v. Flores, — U.S. -, 129 S.Ct. 2579, 2593-95, 174 L.Ed.2d 406 (2009) (discouraging the use of regulatory injunctions in litigation against parts of state government). If Badger Catholic’s fears come to pass, then more relief lies in store. For now, however, a declaratory judgment suffices.
Affirmed