In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1195

WOMEN'S HEALTH LINK, INC.,

*Plaintiff-Appellant,*

*v.*

FORT WAYNE PUBLIC TRANSPORTATION CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:14-cv-00107-RLM — **Robert L. Miller, Jr.**, *Judge.*

ARGUED JUNE 2, 2016 — DECIDED JUNE 22, 2016

Before POSNER and SYKES, *Circuit Judges*, and YANDLE, *District Judge.**

POSNER, *Circuit Judge*. The defendant, colloquially referred to as "Citilink," is a municipal corporation that provides bus service in Fort Wayne, Indiana, and also has regulatory authority over advertisements both inside the buses and on the buses' exterior. The plaintiff is a nonprofit corpo-

---

* Of the Southern District of Illinois, sitting by designation.

ration (which we'll call Health Link for the sake of brevity) that provides health care for women in Fort Wayne. It wanted to post the following advertisement in Citilink's buses:





Citilink refused to allow the ad to be posted. It forbids public service ads that "express or advocate opinions or positions upon political, religious, or moral issues." Although the proposed ad did not express or advocate any such opinion or position, Citilink discovered that Health Link, although it provides a variety of uncontroversial health services, mainly in the form of referrals to providers of health care, is pro-life and so suggests (though not in the ad) that women with unplanned or crisis pregnancies consider health care and related services that provide alternatives to abortion, such as adoption counseling. Since abortion is generally regarded as a moral issue, Citilink concluded that Health Link's proposed ad was ineligible to appear in or on Citilink buses, even though the ad itself—as any reader of

this opinion can see—contains not the faintest reference to abortion or its alternatives.

Furthermore, anyone seeing the ad (were it to be posted in the bus) who navigated to its Web address— womenshealthlink.org (visited June 22, 2016, as were the other websites cited in this opinion)—would find no suggestion that Health Link is pro-life without clicking, in the website, a link labeled "Get Help," and then within "Get Help" another link, labeled "Diaper Project," where the viewer learns that Health Link gives diapers to pregnant women who carry their babies to term rather than aborting them. In a pamphlet available for download, underneath the heading "Help You Can Count On—Medical," the words "abortion" and "adoption" appear, but just the words—there is no amplification. And finally in a link labeled "About Us" appears the statement that "Women's Health Link is leading Fort Wayne to become a community of choice for life affirming healthcare for young women," but "life affirming" is not defined, nor does it necessarily refer to abortion, see, e.g., "Life-Affirming," *Merriam-Webster Dictionary*, www.merriam -webster.com/dictionary/life-affirming. Absent from the website (as from the ad) is any discussion of abortion.

The basis on which Citilink refused to allow the ad to be posted in its buses appears to have been the mention of "life affirming healthcare" or more likely a connection between Health Link and Allen County Right to Life—the person who first emailed Citilink about the ad did so from an Allen County Right to Life email account, and the two organizations share a street address. Yet neither the ad nor Health Link's website mentions Allen County Right to Life, though the link between the two entities was a clue that "life affirm-

ing healthcare" in Health Link's website might well be a pro-life slogan.

It is against this background that Health Link has sued Citilink charging it with, among other violations of constitutional rights, arbitrarily denying freedom of expression, the arbitrariness consisting in the fact that Health Link's proposed ad complies fully with the conditions set forth in Citilink's rules. It is a public service announcement that does not so much as hint at advocating or endorsing any political, moral, or religious position. Even if one goes behind the ad to the organization's website, one must go to the mission statement and the "Diaper Project" pages for an indication of a pro-life position. Yet the district judge granted summary judgment in favor of Citilink. He shouldn't have.

The parties have treated us to an unedifying tour of what is called "forum analysis." As we explained in *Illinois Dunesland Preservation Society v. Illinois Dept. of Natural Resources*, 584 F.3d 719, 722–24 (7th Cir. 2009), the Supreme Court has created a methodology for analyzing the public's right to access government property for expressive purposes, where "forum" denotes public property usable for expressive activity by members of the public ("private speech" in forum jargon). The methodology distinguishes a "traditional public forum" from a "designated public forum" and both from a "nonpublic forum." See *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 44–46 (1983).

A traditional public forum is a street, sidewalk, or park, or some other type of public property that like a street, sidewalk, or park has for a very long time ("time out of mind," as some cases put it, or "from time immemorial," as

others say) been used for expressive activity, such as marches, picketing, and leafletting. See, e.g., *id.* at 45. A designated public forum, illustrated by a public theater, is a facility that the government has created to be, or has subsequently opened for use as, a site for expressive activity. Usually, as in the case of a public theater, "designated forums" are available for specified forms of private expressive activity or at specified times: plays, in the case of a theater, rather than political speeches. Such limitations are permitted; the public owner of a theater need not throw it open for political rallies even though it is physically suited for being so used. But the government is not allowed to discriminate among the plays performed in the theater on the basis of the ideas or opinions that the plays express. See *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Police Dept. of City of Chicago v. Mosley*, 408 U.S 92, 95–96 (1972).

The third category—the "nonpublic forum"—consists of government-owned facilities like the Justice Department's auditorium that could be and sometimes are used for private expressive activities but are not primarily intended for such use. Government can limit private expression in such a facility to expression that furthers the purpose for which the facility was created. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 800 (1985).

Some decisions recognize a fourth category, variously called a "limited designated public forum" (what Shakespeare's Polonius would have called "a vile phrase"), a "limited public forum," or a "limited forum." The terms denote a

public facility limited to the discussion of certain subjects or reserved for some types or classes of speaker, such as an open space in a state university in which members of the university community and their guests—but not uninvited outsiders—are allowed to give talks. See *Gilles v. Blanchard*, 477 F.3d 466, 473–74 (7th Cir. 2007).

It is difficult to discern the difference between such restrictions and the selection that the director of a state theater has to make among theater groups clamoring for access to the stage. Indeed it is rather difficult to see what work "forum analysis" in general does. It is obvious both that every public site of private expression has to be regulated to some extent and that the character of permitted regulation will vary with the differences among the different types of site. Street demonstrations have to be regulated to prevent blocking traffic, and the use of a state theater has to be regulated to ration the use of a limited facility and maintain quality, and obviously the regulations will be very different. The constant, however, is that regulation is not to be used as a weapon to stifle speech just because it is unpopular. And that means that we don't have to decide which type of forum makes the best fit with the display surfaces in and on Citilink's buses; for its refusal to allow Health Link's ad to be displayed is an unjustifiable, because arbitrary and discriminatory, restriction of free speech.

We remind the reader that the refusal to publish the ad had nothing to do with its contents, which are as we've seen innocuous. Compare *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation (SMART)*, 698 F.3d 885, 888, 892–96 (6th Cir. 2012), upholding a transit authority's decision to bar, as a violation of the

authority's ban on political and moral advertisements, an advertisement that read: "Fatwa on your head? Is your family or community threatening you? Leaving Islam? Got Questions? Get Answers! RefugefromIslam.com." Health Link's ad, in contrast to the Fatwa ad, is not political, religious, or moral—types of ad that Citilink bans, whether validly or invalidly, from its buses.

We know that Health Link is pro-life, but nothing in the ad reveals that, and Citilink's official "Policy Governing All Advertising in or upon Citilink Vehicles and Facilities" is limited to material forbidden to be contained in ads in or on its buses. Prohibited is an advertisement that "contains profane language," or "contains an image or description of violence," or constitutes "material that incites, describes, depicts, or represents sexual activities or images or description of human sexuality or anatomy in a way that the average adult, applying contemporary community standards, would find appeals to the prurient interest," or is libelous, or encourages passengers on Citilink's buses to disregard transit safety, and so on. There is nothing wrong with these prohibitions. Government is not required to allow every interior surface of a government facility to be plastered over with obscene, libelous, threatening, vicious, or bigoted placards and pictures. *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974); *Illinois Dunesland Preservation Society v. Illinois Dept. of Natural Resources*, *supra*, 584 F.3d at 724. But none of the prohibitions listed in Citilink's unexceptionable table of exclusions is violated by Health Link's proposed ad, the banning of which can only be deemed discriminatory.

Nothing in Citilink's statement of policy suggests a concern with what may lie behind an innocuous ad—which

might be a website containing forbidden matter or an organization that violated one or more of the restrictions in Citilink's advertising policy. Nothing in Health Link's proposed ad violates *any* of the restrictions. Probably nothing in its website either, but the website's content is irrelevant because, to repeat, Citilink's policy does not extend to websites.

And if one looks up the list of organizations permitted to advertise in or on Citilink's buses, one finds a number that for aught that appears engage in activities that could be considered to be, or to have a flavor of, the moral, the religious, or the political, including services for immigrant communities, a crusade against crime, advocacy of vaccination, promotion of health care, get-out-the-vote campaigns, and a law firm that specializes in disability cases and advertises itself—in apparent violation of Citilink's ad policy—as consistent with "Christian character." Above all, Citilink allows United Way to advertise in its buses even though the website of United Way of Allen County lists a number both of abortion providers, and of health services that have a "pro-life perspective"—and some local United Ways have provided financial support for Planned Parenthood.

But this is an aside. What is important is not what other advertisers are permitted to do but that Citilink's ad censorship policy is limited to ad content, and the content of Health Link's proposed ad lacks the faintest suggestion of a political, religious, or moral aim or agenda. The district judge missed this essential point, stating that Citilink's "restrictions on non-commercial, political, religious, and moral speech apply to the advertiser, not to the service providers listed on their websites." No, the restrictions are limited to

the advertise*ment*; and the ban on non-commercial speech in the bus ads is inapplicable to public service announcements, such as Health Link's proposed ad.

Once a government entity has created a facility (the ad spaces in and on its buses, in this case) for communicative activity, it "must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995). Citilink's refusal to post the ad was groundless discrimination against constitutionally protected speech. Cf. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969).

The judgment in favor of Citilink is reversed with instructions to enter judgment for the plaintiff enjoining Citilink's refusing to post the plaintiff's proposed ad in its buses.